O

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **BRAY INTERNATIONAL, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-98 |
| | § | |
| **COMPUTER ASSOCIATES** | § | |
| **INTERNATIONAL, INC.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM & ORDER

Pending before the Court is Plaintiff Bray International, Inc.'s ("Bray") Motion to Exclude Sue Conger (Dkt. #88). Also pending are Defendant Computer Associates International, Inc.'s ("CA") Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Capers Jones and Gail Flaherty (Dkt. #71); Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Ron Vollmar (Dkt. #83); Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Warren Cole (Dkt. #84).

## Discussion

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. at 1175, 1169 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786 (1993)). "This obligation pertains not only to scientific evidence but to 'all expert testimony.'" *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580 (5th Cir. 2001) (quoting *Kumho Tire,* 526 U.S. at 147). A *Daubert* inquiry may be triggered by calling into question the factual basis, data, principles, or methods relied on by an expert witness. *See Kumho Tire*, 526 U.S. at 147.

*Daubert* listed several factors that may impact a judge's gatekeeping determination. They are (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "'general acceptance'" within a "'relevant scientific community.'" *Rodriguez*, 242 F.3d at 580 (5th Cir. 2001) (quoting *Daubert*, 509 U.S. at 592-94).

Finally, in addition to requiring that a proposed expert's testimony be "reliable," Rule 702 requires that the expert's testimony assist the trier of fact. This requirement has been interpreted to mean that scientific testimony must "fit" the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify. *See Daubert*, 509 U.S. at 592, 113 S. Ct. 2786. In short, under *Daubert* and its progeny, a party proffering expert testimony must show by a "preponderance of proof" that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case. *See id.* at 592 n. 10, 113 S. Ct. 2786.

## I. Bray's Motion to Exclude Sue Conger

Bray has requested the Court to exclude Sue Conger ("Conger") as an expert on the subject of whether CA used its best efforts, consistent with industry standards, to cure defects in its computer program. Conger's definition of industry standard is that "which is driven by market expectation rather than some formalized set of rules." According to Conger, based on her experience in the market, the industry standards with respect to CA's duty to cure any defect in the MK software are "(1) to be available during working hours and (2) to offer remedy of errors

found in its software on a timely basis." Conger opines that determining whether CA satisfied the second element includes such factors as (i) priority, (ii) staff quality; (iii) access; (iv) accuracy; and (v) escalation. Bray acknowledges that Conger created her definition based on her experience in other engagements as a consultant and expert. It argues, however, that the five factors above are not published, not subject to any peer review or testing, and do not begin to approach general acceptance.

The Court finds it compelling that the guidelines of the International Standards Organization ("ISO") and the Institute for Electrical and Electronics Engineers ("IEEE"), which were relied upon by Bray's expert, are not the agreed upon industry standard. Rather those guidelines appear to be ideals against which CA's conduct cannot accurately or realistically be measured. While Bray argues that the factors outlined by Conger were not subject to peer review or testing and not generally accepted, the Court finds the *Daubert* factors inapplicable to this kind of testimony, the reliability of which depends more upon the personal knowledge or experience of the expert, rather than the methodology or theory behind it. *See Kumho Tire*, 526 U.S. 137, 119 S. Ct. at 1175; *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). Given that Bray has not contested Conger's experience in the industry, the Court finds her opinion to be reliable.

Bray also argues that Conger's testimony is irrelevant as it will not assist the trier of fact in making its determination as to whether CA met industry standards. According to Bray, Conger's standard relates solely to a software company's call center, not to whether CA's maintenance organization met industry standards in the design, production, testing, and maintenance of the MK product. The Court disagrees with Bray's relevance arguments. The agreement provides that if the program does not operate according to specifications, CA will "use its best efforts, consistent with industry standards, to cure the defect." Evidence pertaining to

CA's call center, the quality of its staff, and its accessibility is therefore directly relevant to CA's contractual obligation.

Finally, MK requests the Court to bar Conger from testifying about any matter not contained within her report dated August 6, 2004. The Fourth Circuit has addressed the issue of admissibility of expert testimony that exceeds the information in a report. *See Nehi Bottling Co. v. All-American Bottling Corp.*, 8 F.3d 157, 164 (4th Cir.1993). In *Nehi*, the Fourth Circuit held that the district court did not err in allowing the testimony of an expert witness even though the expert's identity was not disclosed until the day before trial. *Id.* The court reasoned that the plaintiff had provided advance notice of his intent to call the expert witness and that the district court required the plaintiff to make the expert available for an interview prior to his testimony. *Id.* The Court's decision turned on whether adequate advance notice was provided. *See id.* The Fifth Circuit has used analogous reasoning. For instance, in *Mills. v. Beech Aircraft Corp.*, 886 F.2d 758, 764 (5th Cir. 1989), the Fifth Circuit held that the lower court properly exercised its discretion when it excluded results from tests conducted by the plaintiff's expert less than a week before trial. The Fifth Circuit reached this result because the plaintiffs failed to inform the defendants of either the extent or results of the tests. *Id.* The defendants only learned of the tests when plaintiff's expert's testimony was offered at trial. *Id.* The Court deems it inappropriate to make a blanket determination that Conger not be allowed to testify on any matter not contained within her report dated August 6, 2004. Conger has a duty to supplement her report in a timely manner as provided by Federal Rule of Civil Procedure Rule 26(e)(1).

II.     **CA's Motion to Strike Bray's Expert Report and to Exclude the Expert Testimony of Capers Jones and Gail Flaherty**

Bray retained the services of Capers Jones ("Jones") and Gail Flaherty ("Flaherty") of Software Productivity Research, L.L.C. ("SPR") to offer an opinion on two topics: (1) whether

the MK software performed according to its specifications and (2) whether CA employed processes consistent with industry standards to ensure the quality of its product. CA requests the Court to strike the report and testimony of Jones and Flaherty on the grounds that the investigation and analysis performed by SPR were inadequate and thus unreliable. More specifically, CA argues that SPR's analysis fails to satisfy Rule 702 and *Daubert* because (1) it failed to test or use the MK software and (2) failed to consider other possible variables or factors that may have contributed to Bray's problems with the MK software. The Court will address each argument in turn.

### A. Failure to Test or Use the MK Software

#### 1. Proving the Existence of a Defect

In its motion, CA argues that, because SPR failed to conduct an investigation into the MK software itself, it has no basis for its opinion that the MK software did not perform according to specifications or that CA failed to behave according to industry standards. Bray does not contest the fact that SPR never tested the product and never took into account alternate explanations for the alleged problems it experienced with the software. Rather, in response, Bray argues that as SPR was not engaged to form any opinions about the MK software's overall functionality, operation of the system itself was unnecessary. According to Bray, testing of the software simply was not necessary to prove the existence of the transaction processing error. Moreover, Bray argues that based upon the complete lack of actual specifications and the admitted fact that the software was defective, SPR had little difficulty in opining that the software failed to perform consistent with its specifications.

The Court agrees with Bray that the failure to test the software was not necessary to prove the existence of the defect. Both Conger, CA's own computer expert, and Linda Butler, a

5

customer support manager, admitted that there was a "bug" in the software. The Court finds this evidence sufficient to support SPR's conclusion that the software contained a defect. Any additional testing to obtain first hand knowledge of the existence of a defect would have been redundant and would not have contributed to the reliability of SPR's conclusion.

### 2. Proving That the MK Software Did Not Perform According to Published Specifications

With respect to whether the software performed according to its specifications, the parties dispute the meaning of the term "specifications." CA contends that the published specifications are the user manuals, because those are the only publicly distributed documents that contain a discussion of the software's functionality. By contrast Bray argues that the term "specifications" refers to the internal technical specifications for the product. At this time, however, the Court does not deem it necessary to decide which specifications control. The dispute over specifications is a matter for the jury to decide. For purposes of CA's motion, the Court still does not deem it necessary for SPR to have tested the MK software to determine that it did not perform according to its published specifications. CA's own expert, Conger, admitted that the software was not meeting its published specifications due to the existence of the defect.

### 3. Proving that the MK Software Caused Bray's Business to Suffer

In its reply, CA argues that SPR's opinion goes far beyond the narrow contractual representations described by Bray in its response. The Court agrees. The Court also agrees that the SPR report goes far beyond the two topics to which it expressly limits itself. For instance, in the "Conclusions" section of its report, SPR notes that "the software caused Bray's business to suffer significantly by inaccurately reporting Bray's financial statements."

In paragraph 14 of its motion, CA makes the broad assertion that courts have routinely excluded expert testimony in cases where the expert fails to perform an inspection of the product

at issue. In support of this proposition it cites cases from other circuits, including *Pride v. BIC Corp.* 218 F.3d 566, 577-78 (6th Cir. 2000) and *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 536-38 (7th Cir. 2000). Though these cases do not stand for the proposition that products must always be inspected by experts, they do indicate that experts must investigate the product when asserting opinions as to causation.

Bray asserts that having SPR physically operate the MK system would have done nothing to assist it in reaching its opinion because the software it would have tested would not have been identical to the software used by Bray. The explanation offered by Bray for the unavailability of the software is that CA failed to safeguard the software after selling it to SSA.[1] The Court finds this explanation to be unclear. Regardless, the Court is not persuaded by Bray's unsupported assertion. Though, in light of the admissions, it was not necessary for SPR to test the software to determine the existence of a defect, it was necessary for SPR to test the software to determine causation. Even if the identical program could not be obtained for testing, an effort could have been made to acquire a similar version of the software. Any relevant presumptions could have then been held against CA if it was in fact at fault for "spoliation" of the program. Here, however, Bray appears to have not even attempted to acquire the software. Accordingly, the Court is of the opinion that the testimony in SPR's report regarding causation should be stricken.

### 4. Criticism of CA's Processes

Finally, CA takes issue with SPR's discussion of its processes because SPR barely mentions whether any changes to these processes (e.g., inspection, compliance with best practices, testing, etc.) could have prevented the alleged bug from occurring. The Court will not

---

[1] The Parties have not informed the Court as to the name of the company represented by the abbreviation SSA.

strike any evidence relating to CA's processes. It should be noted that CA does not challenge the expertise of Jones or Flaherty. The Court finds them to have sufficient experience, training, and expertise to comment upon CA's processes. The Court also finds the conclusions they base on these empirical facts to be reliable.

CA also asserts that SPR has no idea whether anything it claims CA should have done differently would have prevented Bray from receiving the bug, because, *inter alia*, it has never examined the software code, seen it function, or examined any documentation showing how the software was expected to function. CA argues that, without some analysis of that causal link, no opinion by SPR is remotely reliable. The Court disagrees.

    **B.**    **CA's Argument that SPR's Analysis Would Not Assist the Trier of Fact**

Under Section D of its reply, CA argues that Bray has failed to demonstrate how SPR's analysis could assist the trier of fact to understand the evidence. Specifically CA argues that SPR has failed to analyze whether a reasonable software company would have prevented the alleged bug from entering the software. According to CA, SPR's focus on whether CA maintained the internal specifications for the product or whether CA should have done different testing of the product is irrelevant, confusing, and prejudicial without a casual connection between those alleged deficiencies and the software as released and implemented by Bray. Again, the Court is unpersuaded by these arguments. CA has not challenged the expertise of Jones or Flaherty. These criticisms are appropriate for cross examination.

    **C.**    **SPR's Failure to Account for Alternative Explanations**

CA cites *Munoz v. Orr,* 200 F.3d 291 (5th Cir. 2000) for the proposition that, in order to satisfy the reliability requirements of Rule 702, an expert must consider other possible variables. More specifically, CA argues that SPR's opinion is unreliable because SPR did not consider

8

whether Bray's own conduct caused or contributed to the alleged MK Defect. Despite CA's heavy reliance upon *Munoz*, the Court is unpersuaded by the generic assertion that an expert must always consider other possible variables. The *Munoz* court stressed the fact that claims of disparate impact under Title VII by necessity must rely heavily upon statistical proof. 200 F.3d at 300. The Seventh Circuit case cited in *Munoz* for the proposition that failure to control for other explanatory variables makes an expert's opinion essentially worthless was also a discrimination case brought under Title VII. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988). CA does not argue that SPR's conclusions rely heavily upon statistical proof. The Court does not find SPR's opinion unreliable simply because it did not consider whether Bray's own conduct caused or contributed to the defect. That criticism is certainly appropriate for cross examination. Moreover, as stated above, SPR's testimony regarding causation has already been stricken. The Court does not deem it necessary to go further and strike SPR's criticisms of CA's processes, simply because SPR did not examine Bray's conduct.

In sum, SPR's conclusions with regard to whether the MK software caused Bray's business to suffer will be stricken. The remainder of SPR's testimony and report is admissible.

### III. CA's Motion to Strike Bray's Expert Report and to Exclude the Expert Testimony of Ron Vollmar

Bray designated Ron Vollmar ("Vollmar") and the firm of Mann Frankfurt Stein & Lipp as an expert on damages and Bray's accounting procedures. CA moved to strike Vollmar's report and testimony on the ground that the report is based almost entirely upon the unsubstantiated statements of Bray's president, Craig Brown ("Brown"), and thus the report's failure to satisfy the standards of Federal Rule of Evidence 702 and *Daubert*. To be more exact, CA objects to Vollmar's testimony and report generally on the ground that he failed to consider alternative explanations. Additionally, CA objects more specifically to Vollmar's testimony with regard to

9

Refinancing Costs, with regard to Lost Cost Savings, and with regard to Lost Investment Income.

A. Consideration of Alternative Explanations

As it has done throughout its motions to strike, CA once again cites *Tagatz*, for the proposition that failure to account for other explanatory variables renders an expert's analysis essentially worthless. 861 F.2d at1045. CA focuses on Vollmar's opinion that Bray is entitled to damages of the excess interest Bray had to pay to Golub and Associates ("Golub") to refinance its debt and the fees incurred in connection therewith. CA argues that Vollmar failed to account for other factors that could have caused Bray to incur these refinancing costs, such as whether Bray could have maintained its financing with Bank of America and if any damages would have been sustained if it did.

The Court would note, however, that, based upon Vollmar's deposition testimony, it is clear that he did consider alternative factors. On page 12 of his deposition, Vollmar was asked: "And what matters did you exclude from those potential causes [of damages]?" In response, Vollmar answers, "I'm not sure we excluded anything. We considered everything we learned."

Second, as stated above, *Tagatz* and *Munoz*, the cases relied upon by CA for the proposition that an expert must consider alternative factors, were Title VII cases. Title VII cases often are determined on the basis of statistical proof. Though Vollmar's conclusions appear to be based upon statistical analysis, the Supreme Court has held that "a plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 400, 106 S. Ct. 3000, 3009 (1986) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S. Ct. 1089, 1093 (1981)). Accordingly, the Court is unpersuaded by CA's repeated argument that Bray's experts have failed to consider alternative factors.

**B.      Refinancing Costs**

As part of its prayer for damages Bray has sought refinancing costs. These costs represent the sums incurred by Bray in connection with refinancing its debt and the additional interest it had to pay when it refinanced its debt with Bank of America through Golub. Bray argues that it would not have had to incur these costs, if not for the 2000 transaction processing error. This is because it would have instituted cost saving measures and deferred capital expenditures which would have prevented it from violating its loan covenants with Bank of America.

CA argues that Vollmar's own testimony and report show that Bray would have been out of compliance with its loan covenants with Bank of America even if there were never any transaction processing error. Therefore, CA argues that Vollmar's opinion to the contrary should be stricken as unreliable. The Court disagrees with the assertion that Vollmar's own testimony and report show that Bray would have been out of compliance with its loan covenants even if there were no software defect. CA also argues that an exert's testimony on causation must be grounded "in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *See Castelow v. Chevron, USA*, 97 F. Supp.2d 780, 783 (S.D. Tex. 2000) (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). Even assuming these cases apply to the case at bar, there is no indication, that Vollmar's testimony is based upon merely unsupported speculation or subjective belief. There are indications that the Amended and Restated Credit Agreement dated February 28, 2002 required Bray to conduct a recapitalization campaign.

**C.      Lost Cost Savings**

Additionally, CA argues that Vollmar's conclusion that Bray was damaged in the amount of $3,542,000 as lost cost savings is unreliable. CA argues that Vollmar's opinion that Bray

could have implemented the cost saving measures and deferred capital expenditures is unreliable because it is based solely on conversations with Bray's president, Brown. To support its claim, CA references an inventory reduction program Bray claims it would have implemented. CA suggests that Vollmar ignored facts that showed the program could not have been implemented. More specifically, CA refers to testimony from a Mr. Vance, which Vollmar did not read. The Court is of the opinion, however, that Vollmar was entitled to rely on statements made by the Company president as to the feasibility of instituting cost saving plans. Any contrary assertions raised by Mr. Vance go to the weight of Vollmar's testimony. However, a contrary opinion, even one not read by Bray's own expert, will not render his opinion unreliable.

CA also challenged as unreliable Vollmar's opinion that Bray would have deferred certain capital expenditures until after 2002, but for the alleged defect. CA's argument, once again, is that Vollmar's opinion is based solely upon the statements of Brown. Citing, *Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992), CA argues that Brown's state of mind regarding these business decisions is inadmissable, because Brown's opinion cannot be tested. *Salas* is inapposite as that case dealt with a determination by the expert of the defendant's culpable state of mind, which was a question for the jury. In the case at bar, Brown's culpable state of mind is not an issue. The Court is of the opinion that Vollmar is entitled to rely upon the statements made by Brown.

CA next argues that Vollmar's opinion regarding damages caused by capital expenditures that would have been deferred is unreliable because Vollmar admits that he ignored the positive impacts of the capital expenditures. CA has not challenged Vollmar's expertise or qualifications to opine upon the issue of damages. It attacks his report on the ground that his opinion lacks sufficient underlying data. The Court does not believe Vollmar's opinion is unreliable simply because he did not take into account any positive impacts of immediate capital expenditures. Any

arguments to the contrary can be raised on cross examination.

**D.      Lost Investment Income**

In Vollmar's Third Supplemental Report he states that absent the MK Defect, "Bray would have not incurred the fees, excess interest, and other costs and been able to invest this money in Bray and earn a return on this investment." Vollmar opines that had Bray not paid interest to Golub, it would have invested those dollars and earned investment income at a rate of 18% a year. According to Vollmar, Bray is entitled to damages for lost investment income in the amount of $2,908,000. Vollmar also opines that Bray is entitled to post judgment lost investment income at a rate of 18% from the time of entry of judgment until the judgment is paid.

A plaintiff's entitlement to post judgment interest and the rate at which it is calculated is set by statute. The parties do not seem to dispute the fact that Bray's potential entitlement to post judgment interest is governed by statute.

With regard to prejudgment interest, Bray cites *Guidry v. Booker Drilling Co. (Grace offshore Co.)*, 901 F.2d 485, 488 (5th Cir. 1990) for the proposition that 28 U.S.C. §1961(a), the statute providing for interest on any money judgment in a civil case recovered in district court, does not prohibit the imposition of prejudgment interest. However, that case dealt with jurisdiction predicated upon federal question. *See id.* Where jurisdiction is predicated upon diversity of citizenship, state law governs the rate of prejudgment interest. *See Boston Colony Ins. Co. v. Tiner Associates, Inc.*, 288 F.3d 222, 234 (5th Cir. 2002). Thus, Bray's entitlement to prejudgment interest is governed by Texas law. *See International Turbine Services, Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499-500 (5th Cir. 2002) (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex.1998)) and TEX. FIN. CODE § 304.003.

The Court is of the opinion that Bray's claim for lost investment income is in reality a

claim for pre- and post judgment interest. Under Texas law, the proper way to compensate a plaintiff for lost investment opportunity is through the award of prejudgment interest. *See Miga v. Jensen* 96 S.W.3d 207, 217 (Tex. 2003). Accordingly, the Court is of the opinion that Vollmar's lost investment income analysis is irrelevant to the issue of Bray's damages. Therefore, the Court does not deem it necessary to address Vollmar's methodology in arriving at his figure of 18% per year. Vollmar's testimony regarding lost investment income is stricken.

## IV. CA's Motion to Strike Bray's Expert Report and to Exclude the Expert Testimony of Warren Cole

Bray retained the services of Warren Cole ("Cole") of Pannell Kerr Forster of Texas, P.C. ("PKF"), an accounting firm, to (1) confirm the presence of a material software defect, (2) confirm the date that the defect first appeared, and (3) to assess the impact of the MK Defect. As a basis for their opinion, Cole and PKF reviewed and tested roughly 130 transactions that appeared on a "MK Defect Report." The MK Defect Report was prepared using criteria identified by CA. CA moves to strike the report and testimony of Cole on the ground that it is unreliable, fails to satisfy the *Daubert* criteria, and would result in unfair prejudice according to Federal Rule of Evidence 403. Specifically, CA objects generally to the PKF report on the grounds that (1) Cole's analysis of the MK Defect Report is fundamentally flawed as it applies to the amount of any alleged MK Defect, (2) that the report contained two improper revisions, and (3) that Cole's opinions concerning the alleged start date for the alleged MK Defect are unreliable.

### A. Cole's Analysis of the MK Defect Report as it Applies to Quantification of the Alleged MK Defect

CA spends a lot of attention criticizing the validity of PKF's report. Both its motion and reply, however, appear to only focus on Cole's quantification of the alleged computational error.

14

On pages 7 and 8 of its motion, CA lists ten alleged admissions by Cole about his efforts to quantify the amount of the computational error at Bray. These alleged admissions include the following: the existence of negative values which would decrease the total amount of the alleged computational error, Cole's sample size, failure to review for duplicate entries in the MK Defect Report, failure to rule out human error, and the existence of other computational errors other than the MK Defect.

The Court does not deem it necessary to go into detail discussing all ten alleged admissions. In Bray's response, it argues that Cole and PKF are only commenting upon the fact that CA introduced the MK Defect into Bray's system in early 2000, and that the MK Defect miscalculated the freight surcharge variance in an amount that materially overstated Bray's financial statements. Bray itself goes so far as to say that Cole and PKF were not offering opinions on the precise amount of the overstated freight surcharge variance caused by the MK Defect. Moreover, Bray acknowledged that the MK Defect report reviewed by Cole and PKF is not a quantification of damages. Rather, it argues that it is a quantification of the total amount of illusory favorable surcharges included in Bray's 2000 PPV account, which Bray's management relied upon in making business decisions. According to Bray, the issue in the MK Defect report was only whether this amount had a material effect upon Bray's decision making. Bray argues that because it is not suing for the amount in the MK Defect Report, an exact quantification is not required.

Upon a review of CA's arguments and Bray's statements in response, CA's motion is granted to the extent Cole and PKF offer an opinion regarding the numerical value of the MK Defect, but denied otherwise.

**B. Revisions**

CA argues that Cole made two changes to the original PKF report that render the whole report unreliable. Bray's expert report was prepared by Cole's colleague, Brian Baumler ("Baumler"). Apparently, Baumler performed all the testing and prepared the report. According to CA, Cole merely reviewed and edited the report.

With regard to the first change, the original report contained a statement in which Baumler suggested that, because he did not perform an audit, PKF was not offering an opinion "on the foregoing specified elements, accounts or items." He also pointed out that the report "should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of those procedures." CA moved to strike the report arguing that this language means that the report was not intended to be relied upon in court. Bray argues that this language merely indicated "Agreed Upon Procedures." Bray argues that the language was removed because CPAs have different standards for a litigation engagement, than an agreed upon procedures engagement. According to Bray, PKF originally included this language in its initial report because that report was intended to be received by the Bank of America. CA in turn argues that, if the person who prepared the report was using a standard of review that did not result in his ability to accurately express an opinion on the results, then it does not become more reliable merely by removing that disclaimer from the report.

Despite CA's efforts, the Court does not agree. The Court is not convinced that the language in the initial report indicated that Baumler could not *accurately* express an opinion on the results. The language merely indicated that PKF was not expressing an opinion. The removal of the language does not make the report unreliable. More importantly, however, CA has not demonstrated to the Court the inaccuracy of the "specified elements, accounts or items" referred

16

to by the statement in the initial report.

With regard to the second revision, CA argues that Cole deleted a reference in the original report stating that Bray USA made a year end adjustment of about $1.4 million, in order to adjust for the alleged impact of the MK Defect. According to CA, Cole excluded this adjustment in an effort to support the "flawed" premise that the impact of the MK Defect was $2.4 million at the end of 2000. The Court has already indicated that Cole and PKF may not offer an opinion regarding the numerical value of the MK Defect.

### C. Cole's Opinions Concerning the Alleged Start Date for the Alleged MK Defect

The PKF report indicates that the start date for the "MK Defect" was January 6, 2000. One issue in this case is whether CA released the MK Defect in its general release MK 8.1 9902. The general release of MK 8.1 9902 was implemented coincidentally on January 6, 2000. As part of its analysis, PKF selected 10 purchase orders; five with receipt dates processed on or before January 5, 2000 and five with receipt dates processed thereafter. According to PKF's report, none of the transactions with a receipt date prior to January 6, 2000, contained a MK Defect, and all with dates on or after January 6, 2000 contained such an error.

Based upon Cole's deposition testimony, CA argues that Cole admitted his conclusion was incorrect. The Court has not found such an admission in his deposition testimony. CA also argues that Cole agreed that the statements in the report that all purchase orders prior to January 6, 2000 had no defect and all after that date did have a defect were unsupported by the testing. Again, the Court finds no such admission made by Cole. Finally, CA argues that Cole agreed that his work papers do not support his conclusion that the MK Defect was introduced on January 6, 2000. Once again, the Court finds no such admission supported by the evidence.

What CA claims is Cole's admission that the start date is incorrect is in actuality a

17

statement that rests solely upon an assumption. In Cole's deposition, CA refers to a report from 1999 which indicates MK Defects occurred that year. Upon being questioned, Cole indicated that his conclusion regarding the start date is inconsistent with that report. However, that report is at the very least, arguably unreliable given that it was created retroactively on June 10, 2003. Moreover, according to Bray, PKF's 1999 audit indicates that the 1999 report could not have been accurate, because otherwise, Bray would have had an out-of-balance condition in its uninvoiced receipts account in 1999. According to Bray, no such out-of-balance condition existed. Thus, CA cannot rely upon the 1999 report to demonstrate the unreliability of Cole's conclusion.

CA makes additional statements that are unsupported by the pages cited in Cole's deposition. CA attacks the statement in Cole's report that "[n]one of the transactions with a receipt date prior to January 6, 2000, contained a MK Defect, and all with dates on or after January 6, 2000 contained such an error." Citing pages 130 to 132 of Cole's deposition testimony, CA argues that "Cole conceded that 4 of the 5 items selected after January 6, 2000 ***actually had no error at all***, despite the statement in the expert report that 5 of the 5 after January 6 had an error" (emphasis in original). Upon reviewing these pages of Cole's deposition the Court does not find CA's conclusion to be supported by the evidence. Within the pages cited by CA, Cole does state that, other than purchase order 112282, none of the "other purchase orders" looked like they contained a computational error. It is unclear, however, what the phrase "other purchase orders" refers to. Absent more clarity, the Court cannot agree that Cole admitted that four of the five items PKF selected after January 6 contained no errors.

Additionally, citing pages 134 and 163 of Cole's deposition testimony, CA argues that one of the five items selected before January 6, 2000 had some computational error. The Court

18

again finds CA's assertions unsupported by the evidence. On page 134, it appears that CA relies upon one entry from Exhibit 99, which is the 1999 report discussed above. There is no evidence to suggest, however, that entry was one of the ten items reviewed by PKF. Similarly, though there is a hypothetical transactional error made pursuant to a January 4th transaction alluded to on page 163 of Cole's deposition, there is no indication that any such error actually exists. The page numbers cited on page 163 of Cole's deposition do not lead the Court to any such transaction.

CA next attempts to attack PKF's sample size, arguing that a sample of a mere ten items is insufficient to conclude that there were no errors that occurred prior to January 6, 2000. CA argues that even Bray's own response concedes that at least one purchase order out of Cole's five samples prior to January 6, 2000, had a computational error. First, the PKF report did not claim that there were no computational errors that existed prior to January 6, 2000. Rather the report claimed that there were no *MK Defects or errors.* Second, the Court is surprised by CA's assertion regarding Bray's concession because Bray's response states "no tested transaction before January 6, 2000 has ever showed the MK Defect, and every tested transaction after January 6, 2000, containing the actual criteria to trigger the miscalculation, does show the MK Defect." Moreover, the Court is convinced that PKF has not attempted to draw any statistical conclusions from its sample size. PKF has simply chosen a random sample to pinpoint the start date of the alleged MK Defect. Cole's testimony and report on the alleged start date will not be stricken.

In sum, Cole's opinion regarding the numerical value of the MK Defect will be stricken. The remainder of SPR's testimony and report is admissible.

**Conclusion**

For the reasons given above, Bray's Motion to Exclude Sue Conger (Dkt. #88) is DENIED; CA's Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Capers Jones and Gail Flaherty (Dkt. #71) is GRANTED in part and DENIED in part; CA's Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Ron Vollmar (Dkt. #83) is GRANTED in part and DENIED in part; and CA's Motion to Strike Plaintiff's Expert Report and to Exclude the Expert Testimony of Warren Cole (Dkt. #84) is GRANTED in part and DENIED in part.

It is so ORDERED.

Signed this 29th day of September, 2005.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE