# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **BRAY INTERNATIONAL, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-02-98** |
| | § | |
| **COMPUTER ASSOCIATES** | § | |
| **INTERNATIONAL, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM & ORDER

Pending before the Court is Defendant Computer Associates International, Inc.'s ("CA")

Motion for Summary Judgment (Dkt. #65). Upon reviewing the motion, the response, and the

record, the Court is of the opinion that CA's motion should be GRANTED in part and DENIED

in part.

### Factual and Procedural Background

Plaintiff Bray International, Inc. ("Bray") is a Houston-based manufacturer of actuators and

valves. In the summer and fall of 1995, Bray's CIO, David Gent ("Gent"), began searching for a

comprehensive software system to replace its existing IBM Mapics Software ("Mapics"). In 1995,

Bray operated Mapics on AS/400 and wanted its new software program to run on a Windows/NT

("Windows") platform. Though it met with other software providers, Bray ultimately executed a

license agreement with CA for software named MANMAN/X (the "License Agreement") on January

9, 1996.[1] At that time, however, MANMAN/X was generally available to the public for use on

UNIX servers, whereas the Windows version was only available in a developmental beta form. This

---

[1] *See* CA's Motion for Summary Judgment ("Motion"), Exhibit H-1, License Agreement; Bray's Response to Defendant's Motion for Summary Judgment ("Response"), Exhibit P, License Agreement.

meant that the software was still in a testing phase and was not yet generally available to the public. When Bray installed the beta version of MANMAN/X on its system, it did not use the software as its active accounting program. It was only using the software to train its employees and to test it by selecting certain transactions to run using the software. During these first several months the beta version allegedly crashed and was routinely inoperable. In the face of Bray's complaints about these problems and the lack of progress on the Windows version of MANMAN/X, CA representatives allegedly implored Gent and Bray Chief Systems Analyst Morty Mandel not to terminate the License Agreement. At that time, CA also represented that it would provide a generally available Windows version by September 15, 1996.

In late December 1996, CA delivered to Bray the generally available version of MANMAN/X, which had been renamed MK Version 7.0 ("MK 7.0"). Bray was able to install this software and test it without the repeated system crashes that plagued MANMAN/X during the beta period. On February 28, 1997, Bray implemented the software into its live environment and began utilizing the software to conduct all aspects of Bray's business.

In Bray's Second Amended Complaint, it asserts that it encountered difficulties with the MK 7.0 software's accounting and financial reporting functions. These included the following alleged problems: (1) inability to provide a historical "snapshot" of accounts at different points in time; (2) double posting and one sided postings to various accounts; (3) inability to post detail for particular transactions; (4) inability to consolidate financial statements; (5) inability to retain historic foreign currency exchange rates; (6) problems associated with calculating foreign currency exchanges; (7) malfunctioning sub-ledger reports; (8) inability of sub-ledger reports to reconcile to the general ledger; (9) slow changing screens when scrolling; and (10) reports that can only print one line of information per page.

CA's general practice was to request addendums when delivering additional software to

clients.  In August of 1997, CA asked Bray to execute a Product Order and Documentation Update

Form for MK 7.2/9707 ("MK 7.2"), which was a later version of the MK 7.0 software.[2]  On

September 1, 1998, CA and Bray signed an Order Form for the MK Manufacturing/Developer Pack.[3]

This Order Form and the two Addendums to it governed the MK Manufacturing and MK Developer

software, which were later versions of the MK software.  The Addendums to the Order Form of MK

Manufacturing/Developer Pack terminated the licenses for the original programs under the License

Agreement, and extended the terms and conditions of the License Agreement to the new software.

On October 20, 1998, CA and Bray agreed upon another Addendum to the License Agreement (the

"MK 8.1 Addendum") required by CA for MK 8.1 New Technology ("MK 8.1").[4]  The MK 8.1

Addendum was intended to govern the use of MK 8.1 during the beta testing period.   It

supplemented and modified the License Agreement as to the use of MK 8.1, and terminated by its

own terms "upon the earlier of (a) the date of General Availability . . . of the Beta Product, as CA

may determine in its sole discretion, or (b) the date of termination of this Addendum by either party

on not less than 15 days prior written notice to the other."[5]  The parties stipulate that MK 8.1 became

generally available at some point in 1999, thereby terminating the MK 8.1 Addendum.  Thereafter,

CA provided Bray the generally available version of MK 8.1 and various maintenance releases

without requiring Bray to enter into any additional written agreements.   Evidently, no further

Product Order Forms were ever executed after MK 8.1 became generally available and the MK 8.1

_____

[2] Bray's Response, Exhibit Q, Product Order and Documentation Update Form for MK
7.2/9707.

[3] *Id.*, Exhibit R, Order Form for the MK Manufacturing/Developer Pack and the
Addendums thereto.

[4] *Id.*, Exhibit S, MK 8.1 Addendum.

[5] *Id.*

Addendum terminated.

Bray also contends that, on January 6, 2000, it went live with the installation of MK 8.1. Bray asserts that this software introduced a computational error into its system. Bray asserts that it must obtain real time feedback about the costs of goods it acquires to remain profitable. To meet this goal, Bray's accounting system was set up using standard cost accounting, which is common to manufacturers. Standard cost accounting allows a manufacturer to determine if there is a difference between the amount the manufacturer expects to pay for the good (i.e., the "standard cost") and the amount of the actual purchase price of the good. The difference between the standard cost and the actual purchase price is called the "purchase price variance." If there was a difference between the standard cost and the actual purchase price, the MK software would calculate a "purchase result'" which reflected the purchase price variance.

Bray also had to account for its freight bills. Bray chose to account for the "standard cost" of freight by assigning freight a percentage surcharge based on the standard cost of the material. Thus, if the standard cost of the material was $10.00, with a 10% surcharge for freight, then the initial amount calculated for freight would be $1.00. However, if the actual cost of the material diverted from its standard cost creating a purchase result, Bray wanted the freight to be adjusted as well. Therefore, in the above example, if the actual cost of the material purchased turned out to be $11.00, then MK 7.0 would adjust for freight so that it used $1.10 as the amount for freight (10% of $11.00). The amount of the difference between the freight charges, in this example $.10, would be the amount of the "freight surcharge variance."[6]

The freight surcharge variance would typically be a relatively small percentage of the purchase result. Depending on whether the purchase result had been favorable or unfavorable, the freight

---

[6] This example comes from CA's discussion of the facts in its motion for summary judgment. *See* Motion pp. 3-4.

surcharge variance would also be favorable or unfavorable. Bray states that the freight surcharge amount was recorded by Bray as a debit to a general ledger account called "uninvoiced receipts" with a credit to a general ledger account called "purchase price variance." Bray claims that its management tracked this account balance very closely and from time to time would offset Bray's cost of goods sold on the income statement with any favorable variances. It alleges that the total amount of variances in the purchase price variance account had always had a dramatic impact on Bray's management and decision-making.

In October of 1998, another CA client called Arrow Group Industries ("Arrow Group") reported that the MK software was calculating an overstated variance due to a computational error. The Arrow Group was not running MK 7.0, but rather was running MK 8.0. After working on the Arrow Group's complaint for one year, CA engineered a Solution 792. Also in October of 1998, Bray agreed to beta test a new software product called MK 8.1. According to Bray, CA knew that Solution 792 was defective and yet intentionally included it in MK 8.1. Bray installed MK 8.1 in early January of 2000. According to Bray, CA had knowledge of this defect by September of 1999 at the latest, before Bray installed MK 8.1, yet did not provide any warning to its clients, despite its ability to do so with the stroke of a key.

Bray alleges that in January of 2001, some fifteen months afer CA initially knew of the defective Solution 792, it discovered the same apparent defect that had plagued other CA clients. Bray contends that in January of 2001, it discovered that the software was miscalculating the freight surcharge variance on items Bray had purchased from outside suppliers. According to Bray, the error in the software (the "transaction processing error") occurred when the standard cost of a purchased item varied from its actual cost. In these instances, instead of the freight surcharge variance being a percentage of the purchase price variance, it was recording the full freight surcharge amount. Thus, if the freight surcharge variance was 10% of a $100.00 item, a $10.00 favorable freight surcharge

variance was being credited to the purchase price variance account, instead of 10% of the difference between actual and standard cost. According to Bray, not only was the transaction processing error overstating the amount of the freight surcharge variance, it also uniformly reported only a favorable variance (i.e., a credit to the purchase price variance account) instead of showing the actual freight variance.[7]

Bray asserts that the miscalculations performed by MK 8.1 during 2000 caused Bray to make numerous financial decisions on the basis of erroneously stated financial reports and to underestimate its costs for the year, allegedly leading Bray to become out of compliance with its debt covenants. Bray states that it suffered loss of credit, violated existing loan covenants, and was required to make alternative financing arrangements at significantly increased interest rates to mitigate against the damage. Bray refinanced its debt in July 2002 at a higher interest rate. Some time around the summer of 2004, Bray again refinanced its debt at the same interest rate it had originally.

In April 2002, CA sold MK to another software company called SSA. Bray continued to use the MK software at the time CA filed its motion for summary judgment.

Bray initially filed this lawsuit against CA in Texas state court on November 30, 2001. On January 11, 2002, CA removed the case to this Court. Bray filed its First Amended Complaint on July 25, 2003, asserting claims against CA for breach of contract and express warranty, breach of the implied warranty of good and workmanlike performance of services, negligence, fraud, and negligent misrepresentation. On July 28, 2004, after several depositions and completion of additional discovery, Bray filed a Motion for Leave to File Second Amended Complaint. The Court granted that motion

---

[7] The Court would note that this explanation of the defect comes solely from Bray's response to CA's motion for summary judgment. CA states that it does not agree with Bray's description of the MK software's miscalculation. It notes, however, that for purposes of its motion for summary judgment, it will address the allegations made by Bray and the factual testimony of Bray's witnesses.

on March 31, 2005.  In the Second Amended Complaint Bray added claims for breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and breach of express warranty.  CA has moved the Court for summary judgment on all of these claims as reflected in Bray's Second Amended Complaint.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id*. at 322.  If the moving party fails to meet this burden, then they are not entitled to summary judgment and no defense to the motion is required.  *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also*

*Celotex*, 477 U.S. at 323-25. To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223 (5th Cir. 2001); *see also Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## Discussion

In its Motion CA makes four general arguments attacking the merits of all of Bray's claims. The arguments are as follows:

(1) Bray's claims for breach of contract, express warranty, and implied warranties of merchantability and fitness for a particular purpose are time barred by the License Agreement;

(2) The economic loss rule bars any recovery for negligence;

(3) Texas law provides no cause of action for implied duty to repair under the circumstances of this case; and

(4) Bray's claims for fraud and negligent misrepresentation are barred.

The Court will address each argument in turn.

**I.    Viability of Bray's Claims for Breach of Contract, Express Warranty, and Implied Warranties of Merchantability and Fitness for a Particular Purpose**

CA argues that the License Agreement was in effect at all relevant times during the relationship between the parties.  The License Agreement was signed on January 9, 1996, when Bray originally agreed to license the MANMAN/X software.  With regard to the coverage of  the License Agreement, in pertinent part, that Agreement read as follows:

> This Agreement applies to all program code, documentation, training materials, and enhancements embodying or related to the Licensed Program and *any subsequent versions or releases of the Licensed Program* which may be delivered to Licensee and the definition of Licensed Program includes all such code, documentation, materials and enhancements.[8]

The License Agreement also contained a "Limited Warranty" clause which states in pertinent part that:

> CA . . . represents that the Licensed Program will operate according to the specifications published by CA for the Licensed Program.  If it is determined that the Licensed Program does not operate according to such specifications, CA's only responsibility will be to use its best efforts, consistent with industry standards, to cure the defect.[9]

Another provision of the License Agreement that is relevant to this lawsuit falls under heading "Warranty and Liability Limitations."  In all capital letters and bold font, that provision states:

> Except as set forth above, no other warranties, whether express or implied, including, without limitation, the implied warranties of merchantability and fitness for a particular purpose, are made by CA and CA makes no warranties with respect to any hardware equipment which CA may supply together with the Licensed Program or for the implementation thereof.  In no event will CA be liable to Licensee or any other party for any loss, including time, money, goodwill and consequential damages, which may arise form the use, operation or modification

---

[8] CA's Motion, Exhibit H-1, License Agreement; Bray's Response, Exhibit P, License Agreement (emphasis Added).

[9] *Id.*

of the Licensed Program.[10]

In sum, important to this case is the fact that the License Agreement (1) purports to disclaim all implied warranties, including the implied warranties of merchantability and fitness for a particular purpose; (2) specifies that the only express warranty with regard to the operation of the program is that the software will operate according to its specifications; (3) states that CA's only responsibility if the software does not operate according to its published specifications is to use its best efforts, consistent with industry standards, to cure the defect; (4) purports to limit damages by attempting to preclude all recovery or any loss, including consequential damages, time, money, and goodwill; and (5) states that it is applicable to "any subsequent versions or releases of the Licensed Program which may be delivered to Licensee."

A.      Applicability of the License Agreement to Bray's Causes of Action

Many of CA's arguments depend upon the application of the original License Agreement to the MK 8.1 software. Therefore, before analyzing the provisions of the License Agreement as they apply to the legal theories under which Bray claims it is entitled to relief, the Court must determine whether the License Agreement applies to the MK 8.1 software.

CA contends that the original License Agreement applies to all subsequent versions and releases of the Licensed Programs that may be delivered to Bray. Bray, however, argues that the License Agreement does not extend to MK 8.1. The Court agrees with CA that the License Agreement applies to MK 8.1.

In its Second Amended Complaint, Bray asserts that the original License Agreement, signed on January 9, 1996, was terminated by two later agreements governing subsequent versions of the software, the MK Manufacturing/Developer Pack and the MK 8.1 Addendum. The Court

---

[10] *Id.*

disagrees.  The License Agreement was not terminated in whole when Bray signed an Order Form

on September 1, 1998 for the MK Manufacturing and MK Developer Pack software.  The Order

Form signed by Bray states that, "[t]he terms and conditions of the License Agreement or prior

Order Form, as the case may be, referenced by this Order Form shall apply to this Order Form."[11]

> The Addendums to that Order Form contained the following language:
>
> Licensee and CA acknowledge that this license for the Licensed Program and the
> pricing therefore is granted in exchange for the termination of Licensee's previous
> licenses of [the "Original Programs"] pursuant to [the License Agreement] and
> further agree that: . . .
>
> 2.  The license granted under the License Agreement with respect to the Original
> Programs shall be terminated upon the effectiveness of this License, subject to the
> following: . . . .
>
> C.  Except as provided otherwise herein, this License for the Licensed Program
> shall be subject to the terms and conditions as have applied to license for the
> Original Programs. . . .[12]

The Order Form says that the "terms and conditions" set out in the License Agreement apply to the

new software.  Thus, the Order Form merely substitutes the software that was provided by CA, but

does not terminate the relevant disclaimer and limitation of liability terms of the License

Agreement.

The Court also finds that the License Agreement was not terminated by the MK 8.1

Addendum to the License Agreement signed by Bray in October 1998 in connection with the beta

version of MK 8.1.  The MK 8.1 Addendum included the following language: "The referenced

License Agreement is hereby supplemented and modified by this Addendum only as to Licensee's

use of the Beta product.  In the event of any conflict between the License Agreement and this

---

[11] Bray's Response, Exhibit R, Order Form for the MK Manufacturing/Developer Pack
and the Addendums thereto.

[12] *Id.*

Addendum, the terms and conditions of this Addendum shall prevail."[13]  The MK 8.1 Addendum

terminated by its own terms "upon the earlier of (a) the date of General Availability . . . of the Beta

Product, as CA may determine in its sole discretion, or (b) the date of termination of this

Addendum by either party on not less than 15 days prior written notice to the other."[14]  The beta

period is generally a testing period for new software.  During the beta period, both parties had a

number of duties and obligations that they did not have during a non-beta testing period.  It is

therefore a unique period.  The parties stipulate that MK 8.1 became generally available at some

point in 1999, thereby terminating the MK 8.1 Addendum.  Thus, the Court finds that when the

beta period ended, only the Addendum terminated, not the original License Agreement.  It is of no

import that Bray received the generally available version of MK 8.1 and various maintenance

releases without being required to enter into any additional written agreements or executing any

Product Order Forms.  There was no need to enter into any additional agreements because the

original License Agreement still applied.

    Bray next argues that because there is no evidence that MK 8.1 was a subsequent version

of the "MK Manufacturing/Developer Pack" software, a fact issue exists over whether the License

Agreement applies to MK 8.1.  The Court finds this argument to be without merit.  The evidence

clearly demonstrates that MK 8.1 was a subsequent version or release of the software that was

initially subject to the License Agreement.  Bray entered into the License Agreement on January 9,

1996.  Also in January 1996, and possibly on the same date, Bray entered into the Order Form

with CA for the MANMAN/X software.  The MANMAN/X Order Form expressly incorporated

the License Agreement by reference.

---

[13] *Id.*, Exhibit S, MK 8.1 Addendum.

[14] *Id.*

CA later provided Bray with MK 7.0 which was merely a name change from the MANMAN/X software. Then it provided Bray with MK 7.2, which was also a later version of the MK software. Bray then entered into an Order Form with CA for MK Manufacturing and MK Developer Pack, which were both later versions of the MK software. The MK Manufacturing/Developer Pack Order Form and Addendums also expressly incorporated the License Agreement by reference. CA later provided Bray with MK 8.1. The affidavit of Andrea Dick, a Senior Architect at CA, confirms that MK 8.1, specifically MK 8.1 9902, is a later version of the MK Manufacturing software which in turn is a later version of the Licensed Program subject to the original License Agreement.[15] The License Agreement applies to any subsequent versions or releases of the Licensed Program. Thus, there is no genuine issue of material fact as to whether the License Agreement applies to MK 8.1.

Additionally, Bray argues that, even assuming MK 8.1 is a "subsequent version" of MK Manufacturing/Developer Pack software, a fact issue remains because the parties' course of performance was for Bray to submit periodic Product Order and Documentation Update Forms ("Update Forms").[16] These Update Forms are different from the Order Forms which explicitly incorporated the terms of the original License Agreement and explicitly made the new products subject to the same. Bray argues that CA was careful to obtain Bray's signature on an Update Form for the MK 7.2/9707 software, but failed to obtain any such signatures on Update Forms for MK 8.1. Bray's arguments regarding course of performance are without merit. The reason for this is twofold. First, under Texas law, the course of performance between the parties to a contract

---

[15] CA's Reply Brief in Support of its Motion for Summary Judgment ("Reply"), Exhibit A, Affidavit of Andrea Dick.

[16] *See, e.g.,* Bray's Response, Exhibit Q, Product Order and Documentation Update Form for MK 7.2/9707.

cannot be used to contradict the express terms of that contract. TEX. BUS. & COM. CODE ANN. § 1.303(e) (Vernon Supp. 2005); *Global Octanes Texas, L.P. v. BP Exploration & Oil, Inc.*, 154 F.3d 518, 522 (5th Cir. 1998) (stating that the parties' course of performance may not be used to contradict the express terms of a contract). Second, courts may only consider such evidence where the contract is first determined to be ambiguous. 154 F.3d at 522.

The License Agreement here expressly and unambiguously states that it applies to "any subsequent versions or releases of the Licensed Program which may be delivered to Licensee." Though, Bray had historically been sent Update Forms when new program products became available, the Court agrees with CA that those forms merely served as a reminder to the licensee that the software was still subject to the original License Agreement. Bray only refers the Court to one Update Form.[17] Right above the signature line of that form, it states that "[u]se of the referenced software product(s) remains subject to the applicable license agreement and order form."[18] It does not say that by signing the Update Form Bray agreed to be bound by the License Agreement. However, Bray was already bound by that Agreement. There is nothing in the record indicating that CA ever delivered software to Bray without making it subject to the License Agreement.

### B. Bray's Claims for Consequential Damages

For purposes of this section, the issue is whether a limitation of liability clause is void as a matter of law when a separate and/or independent limited, or exclusive remedy fails of its essential purpose. As discussed below, this question presents an issue of first impression under Texas state law. CA argues that Bray's claims for consequential damages are barred by the limitation of liability clause in the License Agreement. In response, Bray argues that it is entitled to all

---

[17] *Id.*

[18] *Id.*

damages, whether direct or consequential, because the limited remedy in the contract failed of its essential purpose. Bray also argues, that even if the limited liability provision is valid independent of the exclusive remedy provision, it is still entitled to recover consequential damages because there is a material question of fact as to whether CA was dilatory and engaged in bad faith in its administration of its warranty obligations.

Three provisions of the License Agreement are relevant to Bray's argument that it is entitled to recover consequential damages: (1) the limitation of liability clause, which precludes Bray from recovering consequential damages; (2) the limited remedy clause, which states that CA will use its best efforts, consistent with industry standards, to cure any defect; and (3) the limited warranty clause, which states that CA warrants that the software will perform according to its published specifications.

### 1.    Enforceability of the Limitation of Liability Clause

Bray's first argument is essentially that if the limited remedy clause fails of its essential purpose, then the separate limitation of liability clause fails as a matter of law. Bray also argues that there is a material question of fact as to whether the limited remedy failed of its essential purpose based upon CA's alleged "dilatory and bad faith warranty performance." CA disputes that the limitation of remedy provision failed of its essential purpose. However, for present purposes, the Court will assume that it has failed of its essential purpose.

TEX. BUS. & COM. CODE ANN. § 2.719(b) (Vernon 1994) provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this tittle."[19] This means that when an exclusive remedy fails of its essential

---

[19] The entirety of § 2.719 reads as follows:

(a) Subject to the provisions of Subsections (b) and (c) of this section and of the preceding section on liquidation and limitation of damages,

purpose, a buyer may seek the entire range of remedies available under the UCC.

In support of its argument, Bray refers the Court to a Fifth Circuit decision applying Alabama law in which the Fifth Circuit stated that the jury was not unjustified in its implicit finding that the warranty operated to deprive the purchaser "'of the substantial value of the bargain.'" *Riley v. Ford Motor Company*, 442 F.2d 670, 673 (5th Cir. 1971). Bray argues that in this case, the Fifth Circuit refused to enforce a limitation of liability clause where the jury found failure of essential purpose. CA argues that the contract in *Riley* did not contain a limitation of liability clause, but rather merely contained a limitation of remedy clause. CA is incorrect. The Warranty in *Riley* stated that, "Ford assumes no responsibility for the loss of use of the vehicle, loss of time, inconvenience or other consequential expense." 442 F.2d at 671. Though this sentence does not contain the word liability, it is essentially a limitation of liability clause.

Nonetheless, the Court does not find *Riley* to control the outcome of this case. The Fifth Circuit stated in passing that the jury's refusal to give effect to the limitation of remedy in the warranty was unjustified. *Id.* at 673. The Fifth Circuit, however, ultimately remanded the case for

---

(1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(2) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(b) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

(c) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

a new trial due to the improper amount of the verdict.  *Id.* at 674.  Accordingly, there was no clear holding by the Fifth Circuit that the limitation of liability clause was trumped by the jury's finding that the limitation of remedy clause failed of its essential purpose.

Therefore, there is no clear Fifth Circuit ruling on this issue, and certainly no ruling from the Fifth Circuit or any other court in the Southern District of Texas interpreting Texas law.[20]  Nor has the Court found any decision of the Texas Supreme Court delineating the rule to be applied in this case.  The question of whether a limitation of liability clause is voided if a limited remedy clause fails of its essential purpose is thus a question of first impression.   Therefore, this Court must predict how the Texas Supreme Court would rule if presented with this question.  *See Stool v. J.C. Penney Co.*, 404 F.2d 562, 562 (5th Cir. 1968).  In *Stool*, the Fifth Circuit stated:

> Thus where the controlling state law eludes the researcher, the court must attempt to ascertain the policy inclination of the state's highest tribunal with regard to the matter in controversy.  Failing that, the court may assume that the state courts would adopt the rule which, in its view, is supported by the thrust of logic and authority.

*Id.*  The Court concludes that under Texas law, sections 2.719(b) and 2.719(c) are independent and free-standing provisions.  That is, even if a limitation of remedy clause fails of its essential purpose, a separate limitation of liability clause remains valid and enforceable.

Bray acknowledges that several courts have held that a limitation of liability clause operates independently of any limited remedy provision.  Bray argues, however, that there is "a legal quagmire" that has divided courts across the nation."[21]  Bray submits that the better weight of

---

[20] In *Eastman Chemical Co. v. Niro, Inc.*, 80 F. Supp.2d 712, 721 (S.D. Texas 2000), another district court in the Southern District of Texas concluded that, under Tennessee law, 2-719(2) and 2-719(3) of the UCC are independent and free-standing provisions.  *See* TENN. CODE ANN. § 47-2-719(2), (3) (1992).  That case did not address the issue of which rule to apply under Texas law.

[21] Some courts that have allowed plaintiffs to recover damages disclaimed under a limitation of liability provision when a limited remedy fails of its essential purpose.  *See Soo Line*

authority has found that when an exclusive remedy fails of its essential purpose, so too fails the

seller's protection from consequential damages. The Court disagrees.

Bray's argument substantially tracks an opinion from the Eastern District of Pennsylvania.

*Caudill Seed & Warehouse Co. v. Prophet 21, Inc.*, 123 F. Supp.2d 826 (E.D. Pa. 2000) ("*Caudill*

*Seed I*"). Bray submits that *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.*, 126 F. Supp.2d

---

*RR Co. v. Fruehauf*, 547 F.2d 1365, 1373 (8th Cir. 1977) (intent of UCC reflects that a remedial limitation's failure of essential purpose makes available all contractual remedies, including consequential damages); *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.*, 123 F. Supp.2d 826, 833 (E.D. Pa. 2000) (holding that the failure of essential purpose of a limited remedy renders a damage disclaimer inoperative); *Deere v. Hand*, 319 N.W.2d 434, 437 (Neb. 1982) (in suit between farmer and seller of farm implements, court concluded that if "the seller is given a reasonable chance to correct the defects and the equipment still fails to function properly," the limited remedy has failed of its essential purpose, and the plaintiff can recover "provable consequential damages, even though specifically excluded by the written warranty."); *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 526 (Wis. 1978).

Other courts have either concluded or recognized that a limitation of liability clause survives a finding that a limited remedy failed of its essential purpose. *See Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1112-14 (Utah 1991) (concluding that plain language of UCC provisions, the associated Official Comments, and policy considerations support interpreting the clauses as independent); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182, 184-85 (Mass. 1990) ("[W]e conclude that the disclaimer of consequential damages is enforceable even though the limited repair or replacement remedy has failed of its essential purpose."); *Kearney & Trecker Corp. v. Master Engraving Co.*, 527 A.2d 429, 437 (N.J. 1987) ("We are also persuaded that many routine business transactions would be dislocated by a rule requiring the invalidation of a consequential damage exclusion whenever the prescribed contractual remedy fails to operate as intended."); *McNally Wellman Co. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1197 (2nd Cir. 1995) ("[A] limitation on incidental or consequential damages remains valid even if an exclusive remedy fails."); *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046-47 (4th Cir. 1989) (noting that recent caselaw supports viewing 2-719(2) and 2-719(3) as separate and independent provisions); *Kaplan v. R.C.A. Corp.*, 783 F.2d 463, 466 (4th Cir. 1986) (recognizing that New Jersey law regards the two clauses as independent); *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable and Cold Storage Co.*, 709 F.2d 427, 435 (6th Cir. 1983) ("[W]e believe that section 2- 719(3) is meant to allow freedom in excluding consequential damages unless a consumer is involved in the contract. This freedom would be abridged by the sweeping interpretation of [2-719(2) ] applied by the district court."); *Chatlos Syss. v. National Cash Register Corp.*, 635 F.2d 1081, 1086 (3rd Cir. 1980) ("It appears to us that the better reasoned approach is to treat the consequential damage disclaimer as an independent provision, valid unless unconscionable.").

937 (E.D. Pa. 2001) ("*Caudill Seed II*") supports its argument that this Court should allow it to recover consequential damages despite the contract's limitation of consequential damages. *Caudill Seed II*, however, merely addresses the issue of whether the plaintiff's complaint sufficiently stated a cause of action. *See* 126 F. Supp.2d at 938. It simply did not address the merits of whether the exclusive remedy in the parties' contract failed of its essential purpose, let alone whether such a failure could void a disclaimer limiting consequential damages.

Nonetheless, the same court addressed that issue in *Caudill Seed I*, an earlier decision in the same case. The *Caudill Seed I* court noted the quagmire referred to by Bray. The court wrote:

> The parties have stumbled into a legal quagmire that has divided courts across the nation. The controversy is over whether the failure of an exclusive remedy referenced in a limitation on liability clause should result in the mooting of the remaining limitations on liability, including damage disclaimers. In other words, is a limitation on liability clause a house of cards that collapses when the exclusive remedy card is removed?

123 F. Supp.2d at 830. Similar to the present case, the court noted that Pennsylvania courts had not yet addressed that question and that there was no binding legal authority to guide the court. *Id.* at 831.

In *Caudill Seed I*, the court acknowledged that other district courts within the Third Circuit favored the approach of enforcing damages disclaimers even when the exclusive remedy is found to fail of its essential purpose. *Id.* It noted three rationales for this approach:

> (1) the failure of a limited remedy and an exclusion of consequential damages are not inextricably linked clauses in a contract; (2) such an approach preserves freely bargained-for rights and concessions and prevents a whole limitation on liability clause from failing because of a partial deficiency; and (3) the buyer, as the party best able to avoid the loss, should bear the burden of product flaws, not the seller.

*Id.* (citing *Middletown Concrete Prods., Inc. v. Black Clawson Co.*, 802 F. Supp. 1135, 1152 (D. Del. 1992). The court disagreed with this reasoning. *Id.* The court first noted that preventing recovery flies in the face of the language of the Pennsylvania UCC. *Id.* at 832. That provision is

identical to the provision in the Texas UCC and states that, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this tittle." 13 PA. CONS. STAT . ANN. § 2-719(b); TEX. BUS. & COM. CODE ANN. § 2.719(b) (Vernon 1994).

> The court also noted that:

> exclusive remedy clauses often (if not only) arise in situations where there is also a disclaimer of damages, because without a disclaimer of damages, a remedy is not exclusive. Thus, in stating that a buyer may avail herself of all the remedies available under the UCC when an exclusive remedy fails in its essential purpose, the drafters of the UCC implicitly instructed that the damages disclaimer has no force when an exclusive remedy fails.

123 F. Supp.2d at 832. Finally, the court also reasoned that in agreements like the one before it, "'parties intended the validity of the consequential damage exclusion to depend on the effectiveness of the limited remedy; if the limited remedy fails, so does the consequential damage exclusion.'" *Id.* (quoting *Middletown Concrete*, 802 F. Supp. at 1151 (quoting Kathryn I. Murtagh, Note, *UCC Section 2-719: Limited Remedies and Consequential Damage Exclusions*, 74 CORNELL L. REV. 359, 369 (1989))). The court reasoned that enforcing a limitation of consequential damages provision "leaves the buyer completely at the mercy of the seller, because the buyer's only remedy is the seller's assurances that it will repair or replace." *Id.* at 833. The court referenced a comment to § 2-719(b), stating that where the remedy fails, the buyer is left without the "fair quantum of remedy for breach of the obligations or duties outlined in the contract."[22] *Id.* at 832. The district court therefore predicted that the Supreme Court of Pennsylvania would conclude  that if an exclusive remedy fails of its essential purpose, a disclaimer of consequential damages would be rendered inoperative, allowing the plaintiff to

---

[22] This same language is found in comment one of the Texas UCC.

recover all damages available under the UCC, including consequential and incidental damages. *Id.* at 833.

Bray also cites *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538 (S.D. Tex. 1997) in support of its argument. In *Metro*, the defendant, a manufacturer of compressors, concealed problems existing in its product from the plaintiff buyer. *Id.* at 546. The court held that the defendant failed to remedy a problem and held that the limited warranty therefore failed of its essential purpose. *Id.* at 560. The court determined that the plaintiff buyer was entitled to rely on the implied warranty of fitness for a particular purpose that it had disclaimed in the contract. *Id.* at 561.

*Metro* does not support Bray's argument that it is entitled to consequential damages. This is because the facts of *Metro* do not indicate that the contract between the parties contained a limitation of liability clause. The court's discussion focused on disclaimers and limitations of a warranty. *See, e.g.,* 984 F. Supp. at 559, 560. That is, the issue of whether a separate and independent limitation of liability clause would be enforceable was not before the *Metro* court.

Bray also refers the Court to *Waters v. Massey Ferguson*, 775 F.2d 587 (4th Cir. 1985). In *Waters*, the plaintiff purchased a tractor that suffered from hydraulic failures shortly after he purchased it. 775 F.2d at 589. The purchase agreement contained a limitation of warranty and limitation of liability clause. *Id.* at 590. The clause indicated that the seller defendant's only and exclusive responsibility was to correct defects in the product. *Id.* It also declared that, "[i]n no event shall the owner be entitled to recover for incidental, special or consequential damages such as but not limited to, loss of crops, loss of profits or revenue, other commercial losses, inconvenience or cost of rental or replacement equipment." *Id.* (capitalization omitted). The defendant arranged for prompt service attention, but its service personnel were not able to solve

the problem. *Id.* at 589. The damage to the tractor required the plaintiff to hire neighboring farmers to plant his fields. *Id.* However, because the neighboring farmers planted their crops first, the plaintiff's fields were planted after the optimal spring planting season. *Id.* The plaintiff's crops and income suffered as a result. *Id.* The parties agreed that the exclusive remedy failed of its essential purpose. *Id.* at 90. The issue was whether, in light of the failure of essential purpose, the plaintiff would be able to recover consequential damages that were disclaimed in the parties' agreement. *Id.* The Fourth Circuit held that the plaintiff was entitled to consequential damages. *Id.* at 593. The Fourth Circuit held that though there was an independent sentence which suggests an "unbounded ambition to exclude," looking at the general purpose of the contract, the limitation of consequential damages was only a disclaimer of consequential damages pending repair. *Id.* at 592. The Court, however, noted that it advanced "no general opinions about the enforceability of another warranty that does purport to exclude seller liability for consequential damages." *Id.* at 593. Thus, the Fourth Circuit's decision has no bearing on a case where the facts indicate that the limitation of liability for consequential damages clause was intended to apply absolutely, and not simply pending repairs.

The Court finds that the limitation of liability for consequential damages clause in the contract before the Court was intended to apply absolutely. Unlike the farmer in *Waters*, both parties are sophisticated entities and the people that negotiated the License Agreement are well-educated individuals with significant business experience. Had the parties intended only to limit consequential damages pending repair of the software program, the License Agreement should have provided so explicitly. The Fourth Circuit's decision therefore is distinguishable from the case at bar.

Two other cases lend further support to Bray's argument that the Court should void the

22

limitation of liability clause in the License Agreement. *See Soo Line R. Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977); *Krupp PM Engineering, Inc. v. Honeywell, Inc.*, 530 N.W.2d 146, 149 (Mich App. 1995). In *Soo Line*, the plaintiff railroad sued the manufacturer of railroad cars that it purchased for breach of contract and negligence in the manufacture of the railcars. 547 F.2d at 1368. The Eighth Circuit allowed the plaintiff to recover despite the existence of a separate and seemingly absolute limitation of liability clause. *Id.* at 1370, 1373-74. The *Krupp* court also allowed the plaintiff to recover consequential damages based upon a finding that the exclusive remedy failed of its essential purpose. 530 N.W.2d at 149. CA attempts to distinguish *Krupp* on the ground that it did not specifically address the issue of whether a separate, independent limitation of liability clause can survive when a limited remedy fails of its essential purpose. CA's assertion is incorrect. In *Krupp*, it is patently clear that the limitation of liability clause was separate and independent of the limitation of remedy clause. The clause stated the following:

> With exception of the 12 month warranty, set forth above, the company makes no express warranties, no warranty of merchantability and no warranties which extend beyond the description on the face hereof. In no event will the company be liable for indirect, special or consequential damages of any nature whatsoever.

530 N.W.2d at 149 (capitalization omitted). In contrast to CA's assertion, this language indicates that there was a separate exclusive warranty clause "set forth above" the quoted language. This limitation of liability clause therefore was separate and independent of the limitation of liability clause. Yet, despite this distinction, the Court of Appeals of Michigan voided the consequential damages provision. *Id.* at 1370, 1373-74. Further, CA's own "Warranty and Liability Limitations" provision tracks exactly the same pattern as the contract in *Krupp*. That provision states that with the exception of the warranty "set forth above" all other warranties are disclaimed. Just as in *Krupp*, the next sentence in the provision contains the limitation of liability clause. Thus, CA fails in its attempt to distinguish *Krupp*.

There are numerous cases, however, that do support CA's position. *See Eastman Chemical Co. v. Niro, Inc.*, 80 F. Supp.2d 712, 721-22 (S.D. Texas 2000) (listing cases that have either concluded that independent limitation of liability provisions are enforceable even if the limited remedy fails of its essential purpose or recognized existing state law as such). The Court finds it most helpful to examine the Third Circuit's decision in *Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir. 1980).

In *Chatlos*, the plaintiff purchased a computer system from the defendant. *Id.* at 1083. The computer program was designed to help the plaintiff with its accounting and bookkeeping. *See id.* Due to the expense of the program and the fact that the defendant would not extend credit, the plaintiff entered into a leasing agreement with a bank whereby the bank purchased and owned the program, but leased it to the plaintiff. *Id.* Soon after the system was up and running, the plaintiff began experiencing problems with the software. *Id.* at 1084. The plaintiff asked to cancel the lease, but upon request, allowed the defendant to have some time to make the program operational. *Id.* However, the problems with the software persisted more than a year later, and the plaintiff again asked the defendant to terminate the lease. *Id.* at 1084, 1086. The defendant refused. *Id.* at 1084.

The Third Circuit Court assumed that the contract had an exclusive or limited remedy and found that, due to failure to repair, that assumed limited remedy failed of its essential purpose. *Id.* at 1085, 1086. The court thus stated that the contractual limitation was unenforceable and did not preclude the plaintiff from recovering damages for breach of warranty. *Id.* at 1086. The Third Circuit, however, refused to void the limitation of consequential damages clause. *Id.* at 1087. The court reasoned that, under the UCC, the limitation of consequential damage provision and the limitation of remedy provision were independent provisions. *Id.* at 1086. It stated that a limited

remedy of repair and a consequential damages exclusion are two discrete ways of attempting to limit recovery for breach of warranty and the UCC treats them each by a different standard.  *Id.* The Third Circuit noted that the "former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable."  *Id.*

Similar reasoning has also been employed by the Utah Supreme Court.  *See Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108 (Utah 1991).  That court reasoned that:

> This independent reading of the two provisions also conforms to the general rule that we should construe statutory provisions so as to give full effect to all their terms, where possible. . . . If we were to read subparts (2) and (3) as dependent, we would effectively read out the unconscionability test of subpart (3) for determining the validity of a provision limiting incidental and consequential damages and substitute "failure of essential purpose" from subpart (2) as the operative text. Such a reading seems to fly in the face of the plain language of the statute.

*Id.* at 1112 (citation omitted).[23]  The Utah Supreme Court went on to address the "legislative history" of the UCC.  The comments to both the Utah and Texas UCC allow limitations on remedies to be voided under certain circumstances.  *See id.* at 1113; *see also* UTAH CODE ANN. §2-719; TEX. BUS. & COM. CODE ANN. § 2.719 (Vernon 1994).  However, the Utah Supreme Court noted that the comments state that parties who intend to conclude a contract for the sale of goods "must, accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract."  *See id.*  The court noted that "Such a 'fair quantum of remedy for breach' is available when subparts (2) and (3) are given an independent reading."  *Id.*

The Utah Supreme Court also stated that an independent reading of Utah UCC provisions 2-719(2) and (3) is supported by sound policy considerations.  *Id.*  It stated that "the policy

---

[23] Under the Texas UCC, provisions (2) and (3) are labeled (b) and (c).  *See* TEX. BUS. & COM. CODE ANN. § 2.719 (Vernon 1994).

considerations that seem to underlie the decisions holding the two subparts dependent appear reconcilable with the considerations underlying those holding them independent." *Id.* The court noted that the policy considerations change based upon the context in which the agreement was made. *See id.* at 1114.

> When trial courts are addressing the subpart (3) issue of unconscionability in any specific case, they should take an approach that frankly recognizes the differences that inhere in consumer, as opposed to commercial, settings and affect the determination of unconscionability. . . . Under such an approach, the trial court confronted with an issue of unconscionability takes into account any disparities in bargaining power between the parties, the negotiation process, if any, and the type of contract entered into by the parties, specifically addressing whether the contract was one of adhesion. As noted above, in practice after these factors are examined and weighed, a trial court will generally find that provisions limiting incidental and consequential damages are unconscionable in consumer settings and consionable in commercial settings.

*Id.* Thus, the Utah Supreme Court noted that the unconscionability analysis will equalize any unfairness in limitation of liability provisions.

Upon a review of the arguments on both sides, the Court is more persuaded by the reasoning of courts that treat limitation of liability provisions and limitation of remedy provisions as independent under the UCC. Accordingly, the Court predicts that the Texas Supreme Court would hold that a limitation of liability clause that purports to exclude any and all liability for consequential damages, like the one in the instant case, cannot be voided even if a limited remedy clause fails of its essential purpose. Thus, for purposes of the enforceability of the limitation of liability clause, the Court need not determine whether the exclusive remedy (i.e., requiring CA to use its best efforts, consistent with industry standards, to cure defects) failed of its essential purpose.[24]

---

[24] The Court notes, however, that though it will not discuss whether Bray's exclusive remedy failed of its essential purpose, it will discuss below whether there is a genuine issue of material fact as to Bray's claims that CA breached its warranty under the License Agreement.

### 2. Unconscionability

The Court must now analyze the limitation of liability clause under the unconscionability standard set forth in § 2.719(c).  The Court finds that the parties' original License Agreement is not unconscionable.  TEX. BUS. & COM. CODE ANN. § 2.302 (Vernon 1994) governs Texas law with regard to unconscionability.  The Fifth Circuit has recognized that § 2.302 is intended to allow courts to pass directly on the unconscionability of a contract or a particular clause therein and to make a conclusion of law as to its unconscionability.  *Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 799 (5th Cir. 1973), *overruled on other grounds by Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345, 1350 n. 3 (5th Cir. 1987).  The first comment to § 2.302 states that the  basic test is "whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."  TEX. BUS. & COM. CODE ANN. § 2.302 (Vernon 1994).  To show unconscionability, the plaintiff must show either procedural unconscionability (i.e., evidence of the seller's overreaching or sharp practices combined with the buyer's ignorance or inexperience) and substantive unconscionability (i.e., the terms of the contract are one-sided or oppressive).  *Arkwright-Boston Manufacturers Mutual Insurance Co. v. Westinghouse Electric Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988).  The plaintiff bears the burden of proving unconscionability.  *Id.*

Bray has not satisfied its burden of producing any facts to demonstrate unconscionability.  First the parties were both sophisticated business entities that transacted at arm's length.  Bray has subsidiary companies throughout the world, including Mexico, Canada, Hong Kong, and China.  Moreover, the contract negotiations were conducted by a number of Bray's most important officers all of whom are well-educated and have significant business experience.  Second, there

was no disparate bargaining power between the parties.  Bray had discussions with other software companies and ultimately chose to transact with CA.  Finally, Bray has not produced any evidence demonstrating that CA engaged in overreaching or sharp practices.

Moreover, the clause limiting liability for consequential damages does not violate public policy.  The Fifth Circuit has recognized that, "[u]nder Texas law, 'contracting parties can limit their liability in damages to a specified amount.'"  *Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998) (quoting *Vallance & Co. v. Anda*, 595 S.W.2d 587, 590 (Tex. Civ. App.–San Antonio 1980, no writ) (non-UCC case regarding services contract); (citing Tex. Bus. & Com. Code Ann. § 2.719(a)(1) (West 1994).  The Fifth Circuit also noted that, under Texas law, "'it is immaterial whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach.'"  *Id.* (quoting *Vallance*, 595 S.W.2d at 590).  The Court finds that it is a reasonable business practice to limit damages to direct damages in the circumstances of this case, where the two parties were sophisticated business entities, and where consequential damages in the event of a problem could be extensive.  *See Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182, 185 (Mass. 1990) (quoting *Deerskin Trading Post, Inc. v. Spencer Press, Inc.*, 495 N.E.2d 303, 307 (Mass. 1986)).

In sum, the Court determines as a matter of law that neither the contract as a whole nor the provision limiting liability for consequential damages is unconscionable or in violation of Texas public policy.  Accordingly, that provision is valid under § 2.719(c).

### 3.    Application of the "Bad Faith" Test

There is one more issue that must be addressed with regard to consequential damages.  Some courts that have held that the limitation of liability clauses and limitation of remedy clauses are independent provisions under the UCC, still allow recovery where a seller has been shown to

act fraudulently, in bad faith, or where the seller has been dilatory in performing repairs under a warranty.[25] Rather than challenging the application of this "bad faith" test and the cases employing it, CA simply argues that it was not dilatory in its repair efforts and did not act in bad faith.[26] The Court finds the "bad faith" test to be a sensible rule and should be applied to the case at bar. *See* CORBIN ON CONTRACTS (1962) § 1472 ("It is not illegal for a party to a contract to limit his liability in damages for non-performance of his promises, although such provision is not effective in case he acts fraudulently or in bad faith.").

Bray argues that the summary judgment evidence reveals that CA knew Solution 792 was defective prior to its publication and inclusion in the MK 8.1 software. Bray contends that CA received at least two complaints from clients who experienced problems with variance calculations. It also asserts that CA knew about this defect in September 1999, three months before Bray installed the software. Bray also argues that CA had the capacity to warn all of its clients about the defect with a keystroke, but chose not to because sending such a warning was too burdensome. Finally, Bray asserts that CA created a solution more than six months before Bray allegedly first became aware of the defect. In response to these allegations, CA argues that Bray admits in its Second Amended Complaint that CA had completely cured the defect within six

---

[25] *See, e.g., Chatlos Syss.*, 635 F.2d 1081, 1087 (3d Cir. 1980) ("This is not a case where the seller acted unreasonably or in bad faith"); *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir. 1978) ("The seller . . . did not ignore his obligation to repair; he simply was unable to perform it"); *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 768 (1st Cir. 1996)*; Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 678 F. Supp. 208, 212 (C.D. Ill. 1988) (buyer failed to allege that seller was "wilful or dilatory in failing to meet its warranty obligations").

[26] The Court acknowledges that in Bray's response it only argued that CA was dilatory and acted in bad faith in performing its warranty obligation. Nonetheless, the "bad faith" test also applies to void limitation of liability clauses where a party acted in bad faith in such a manner as to willfully repudiate the contract. *See Cambridge Plating*, 85 F.3d at 768 (holding that limitation of damages provision is not enforceable under Massachusetts law if defendant either willfully repudiated or was willfully dilatory in performing its warranty obligations).

weeks.  CA contends that this proves that it was not dilatory and did not engage in bad faith conduct.  Despite CA's arguments, the Court finds that there is a genuine issue of material fact as to whether CA was dilatory in curing the defect or acted in bad faith.  First, the Court does not have enough evidence to determine whether, in this context, six weeks is a sufficiently short period of time to preclude a finding that CA was dilatory in performing its warranty obligations.  Second, CA does not present any argument, let alone evidence, purporting to demonstrate that it acted in good faith in performing its obligations under the contract.  Accordingly, CA is not entitled to summary judgment on the issue of consequential damages.

### C.    Bray's Claims for Breach of Express Warranty

CA also moves the Court for summary judgment on any express warranties referred to by Bray other than those included within the License Agreement.  It argues that the only express warranty in the License Agreement is that the product "will operate according to the specifications published by CA for the Licensed Program."  CA takes issue with Bray's claims for recovery based upon what it describes as two "other" warranties, namely those that came as a result of providing a sample or model of the MK software to Bray in 1998 and by providing a product description through its user manuals.

As discussed below, CA has moved for summary judgment on the ground that Bray has no evidence of direct damages to support its claim for alleged breach of contract/violation of the License Agreement.  It did not argue that it was entitled to summary judgment on the ground the program operated according to its published specifications.  Because CA does not address the merits of Bray's breach of warranty claim in its motion for summary judgment or its reply, the Court finds that there is a factual controversy as to what constitutes "published specifications" in the software industry or, alternatively, whether any "published specifications" even exist for the

MK software.  As such, the Court will not grant summary judgment on what CA describes as the "other" warranties that came as a result of providing a sample or model of the MK software to Bray in 1998 and by providing a product description through its user manuals.  There is a material question of fact as to whether or not those two warranties were "specifications published by CA for the Licensed Program."

**D.**    **Bray's Claims for Breach of the Implied Warranties of Merchantability and Fitness for a Particular Purpose**

CA has moved the Court for summary judgment on Bray's claims for breach of the implied warranties of merchantability and fitness for a particular purpose.  Under the Texas UCC, a party may waive the implied warranties of merchantability and fitness for a particular purpose.  TEX. BUS. & COM. CODE ANN. § 2.316 (Vernon 1994).  In order to disclaim merchantability, the disclaimer must mention merchantability and, in the case of a writing, be conspicuous.  *Id.*  To exclude any implied warranty of fitness, the disclaimer must be both in writing and conspicuous. *Id.*  The Court finds that the language in the License Agreement was sufficient to properly disclaim both the implied warranties of merchantability and fitness for a particular purpose.[27]  The disclaimer was in bold, capitalized writing and explicitly declared that the implied warranty of merchantability and the implied warranty of fitness for a particular purpose were being disclaimed.  Thus, CA is entitled to summary judgment on Bray's claims for the implied warranties of merchantability and fitness for a particular purpose.

**E.**    **Bray's Claims for Direct Damages for Breach of Contract**

The Court now addresses Bray's claim that CA breached the contract by failing to properly

---

[27] *See* CA's Motion, Exhibit H-1, License Agreement; Bray's Response, Exhibit P, License Agreement.  *See also* the language of the disclaimer under the heading "Warranty and Liability Limitations," *supra*, at pg. 9.

execute its obligations under the warranty. Again, CA warranted that the software would perform according to the specifications published by CA for the Licensed Program. For purposes of this section, the Court need not address whether the contract's limited remedy failed of its essential purpose. It need only address whether Bray failed to perform its obligations under the License Agreement.[28]

CA has moved the Court for a no evidence summary judgment on the ground that Bray lacks evidence of any direct damages, whether "out of pocket" or "benefit of the bargain damages," caused by the alleged breach of contract/violation of the License Agreement. Under the Federal Rules of Civil Procedure, if the non-movant is unable to produce facts supporting the elements of the claims it has pleaded, summary judgment may be granted. *See Celotex*, 477 U.S. at 324.

CA argues that Bray has no admissible evidence of direct damages and, even if it could produce some evidence of the alleged damages, Bray has no evidence that any of its claimed damages were proximately caused by CA's conduct. CA states that the only direct evidence that Bray has is the affidavit of its president, Craig Brown ("Brown").[29] In his affidavit, Brown states the following:

> According to the documents I have reviewed, Bray was invoiced a total of $770,190.46 for the MK Software and for various maintenance support of the software. It is my opinion that the actual value of the software is zero. This

---

[28] In its brief, Bray argues that Fifth Circuit and Texas law make clear that if an *express warranty* fails of its essential purpose, the aggrieved party is entitled to all damages under the UCC. This is an incorrect statement of the law. The law is that such recovery is allowed if a *limited remedy* provision fails of its essential purpose. Moreover, as alluded above, the Court need not determine whether the essential remedy failed of its essential purpose because such a determination does not entitle Bray to consequential damages and is irrelevant to determining whether CA acted in bad faith or was dilatory in performing its obligations under the contract.

[29] See Bray's Response, Exhibit X, Affidavit of Craig Brown.

opinion is based on my belief that if an accounting software product is incapable of producing accurate financial statements, or secretly and erroneously overstates the income statement by several million dollars in a single calendar year, it is essentially useless. While the software certainly did function to some degree, we would never have agreed to purchase it had we known it would not perform to its specifications, which certainly included representations that it would produce accurate financial statements.

CA objects to this testimony on the grounds that it is conclusory and that Brown is not qualified to render such an opinion. It also argues that Bray's Chief Information Officer and its Chief Systems Analyst testified that the software did have value to Bray. The Court disagrees with these arguments. The testimony is not conclusory because Brown provides a basis for his assertion that the software program was of no value to Bray. As Bray's president, he was clearly qualified to give his opinion on the value of the software to the company, even if he has not been qualified as an expert on software. Further, the fact that other Bray representatives declared that the software had some value does not render Brown's testimony irrelevant. Even if the software did have some value to Bray, that does not mean that Bray received the quality of software it bargained for under the contract. Bray has presented evidence that the software did not operate according to its specifications. If that is true, then there was clearly some damage to Bray. There is simply a material issue of fact as to the amount of direct damages suffered by Bray. Moreover, if due to the software's failure Bray did not receive the benefit of its bargain under the contract, then any damages resulting from such failure would be proximately caused by CA's conduct. Accordingly, CA is not entitled to summary judgment on plaintiff's claim for breach of contract.

## II.      Viability of Bray's Claims for Negligence

CA argues that the economic loss rule bars any recovery by Bray on its claims for negligence. The Court agrees. The economic loss rule precludes recovery of economic losses in negligence cases when (1) the loss is the subject matter of a contract between two parties, and (2) a

plaintiff brings a negligence action against the manufacturer or seller of a defective product where the defect results in damage only to the product and not to a person or to other property. *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285 (Tex. App.–Houston [14th Dist.] 2000, no pet.).

The distinction between contract and tort actions is not always entirely clear. *See generally* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 TEX. TECH. L. REV. 477 (1992). However, the mere fact that an act is done pursuant to a contract does not shield it from the general rules of tort liability. Depending on the circumstances, a party's acts may breach duties in tort or contract alone or simultaneously in both. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).

The nature of the injury suffered generally determines the existence of a cause of action in tort. *Id.* When the injury consists only of economic loss to the subject of the contract itself, the action sounds in contract alone. *Id.* It is also instructive to examine the duties that the defendant has allegedly breached. If the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). Conversely, if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. *Id.* It has been noted that, "[t]ort obligations are in general obligations that are imposed by law–apart from and independent of promises made and therefore apart from the manifested intention of the parties–to avoid injury to others." W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th Ed. 1984).

The distinction between violating a contractual duty and violating the common law duty of

due care is illustrated by *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508 (Tex. 1947).

In *Scharrenbeck*, the defendant was hired to repair a water heater in the plaintiff's attic. *Id.* at

508-09. When the heater subsequently malfunctioned and ignited the roof, destroying the house

and its contents, the plaintiff sued in tort. *Id.* at 509. The Texas Supreme Court held that the

defendant's negligence in repairing the heater gave rise to a tort claim despite the contractual

context. The Texas Supreme Court recently summarized and reaffirmed the rationale of

*Scharrenbeck*:

> Although the contract obligated the defendant to put the water heater back in good
> working order, the law also implied a duty to the defendant to act with reasonable
> skill and diligence in making the repairs so as not to injure a person or property by
> his performance. In failing to repair the water heater properly, the defendant
> breached its contract. In burning down plaintiff's home, the defendant breached a
> common-law duty as well, thereby providing a basis for plaintiff's recovery in tort.

*DeLanney,* 809 S.W.2d at 494.

Bray is suing over losses resulting from the MK software, which is the subject matter of a

contract between two parties. Also, Bray simply does not contend that the product caused

damages to a person or any other property. The economic loss rule thus precludes Bray from

recovering under a negligence theory.

Bray's arguments that it is entitled to maintain a cause of action are inaccurate. Bray

makes two arguments in support of its belief that it is entitled to recover under a negligence theory.

First, it argues that the economic loss rule merely means that a plaintiff cannot recover under a

negligence cause of action when it has suffered no injury beyond the economic loss to the subject

of the contract itself. In support of this argument, Bray cites *Thomson v. Espey Huston & Assocs.,*

*Inc.*, 899 S.W.2d 415 (Tex. App.–Austin 1995, no writ), where a court recognized a negligence

cause of action because the damage extended beyond the damage of the contract itself. In

*Thompson*, the plaintiff real estate developer entered into two contracts with the defendant

engineering consulting firm relating to the construction of an apartment complex.  *Id.* at 417.  One of the contracts obligated the defendant to design a drainage system.  *Id.*  After the drainage system was built, it became apparent that the drainage system had some design and construction defects.  *Id.*  The plaintiff alleged that the negligence in designing the drainage system caused damage to other parts of the apartment complex, specifically resulting in cracking walls, doors which would not fit properly, mildew, standing water, and shifting and formation of water pools in one area of the complex that blocked the street and spilled onto adjacent property.  *Id.* at 421-22.  Thus, the basis for the court's reversal of summary judgment for the defendant was that the plaintiff had alleged that the defect in the drainage system produced damage to other property besides that which was the subject matter of the contract.  In fact, the court noted that were the plaintiff "merely complaining that the drainage system was inadequate and that he had been forced to repair or improve it, he would have only a contractual claim."  *Id.* at 422.  This case simply does not support Bray's claim that it can pursue a negligence claim because the MK software itself was defective.

Second, Bray argues that the "iteration" of the economic loss rule, which requires physical injury or property damage, is plainly not applicable under these facts because Bray falls under an exception to this rule.  Bray argues that the distinction that the law draws between tort recovery for physical injuries and warranty, or contract recovery for economic loss does not apply to the case at bar.  *See Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 79 (Tex. 1977).  In support of this argument, Bray cites the following language:

> The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.  He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm.  He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet

the consumer's demands.

*Id.* (quoting *Seely v. White Motor Co.*, 63 Cal.2d 9, 23 (Cal. 1965)). Bray argues that because CA agreed that its product was designed to meet Bray's demands, it can recover for its economic loss under a tort theory of negligence. Bray's argument has no merit. Bray selectively quotes this language used in *Nobility Homes*. The language was cited by the *Nobility Homes* court only for the proposition that a plaintiff cannot recover economic loss based on a theory of strict liability. 557 S.W.2d at 79. The quoted language simply was not used by the Texas Supreme Court to address a plaintiff's ability to recover for economic loss under a negligence cause of action.

With respect to negligence, the *Nobility Homes* court simply held that a cause of action exists for negligence if a plaintiff, not in contractual privity with a defendant, suffers an economic loss for a defective product. As CA and Bray were clearly in contractual privity, Bray could not and did not seek any recovery on the same basis of negligence allowed in *Nobility Homes*. Thus, contrary to Bray's assertions, the *Nobility Homes* court did not create an exception to the economic loss rule that allows recovery under a negligence theory on the basis of a defendant agreeing that a product was designed to meet a consumer's demands. The Court holds that plaintiff's negligence claims are barred by the economic loss rule. CA is entitled to summary judgment on this claim.

### III. Bray's Claims Based upon an Implied Duty to Perform Repair and Modification Services in a Good and Workmanlike Manner

In its Second Amended Complaint, Bray alleges that CA breached an implied warranty of good and workmanlike performance of repair and modification services. CA has moved for summary judgment on this claim arguing that no such cause of action exists under the circumstances of this case. The Court agrees that Bray cannot state a claim for relief based upon an implied duty to repair and perform modifications in a good and workmanlike manner.

The implied duty to perform repair services in a good and workmanlike manner was first

created by the Texas Supreme Court in *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex. 1987). In that case, the plaintiffs bought a prefabricated home that suffered from defects at the time of purchase. *Id.* at 351. The homebuilder came to the house on two separate occasions, but its efforts to repair the home were unsatisfactory and created additional damage to the home. *Id.* The Court addressed the issue of whether it should recognize an implied warranty that repair services be performed in a good and workmanlike manner as a matter of public policy. *Id.* at 352-53. The Court held that an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner was available to consumers suing under the Deceptive Trade Practices Act ("DPTA"). *Id.* at 354.

In *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50 (Tex. 1998), the Texas Supreme Court declined to extend the *Melody Home* rule outside the context of consumers of existing tangible goods suing under the DPTA. In that case, the petitioner defendant contracted with the plaintiff to provide support and maintenance for two helicopters that were to be used to assist with the emergency transportation of patients. *Id.* at 51. While performing its contract obligations, the petitioner allowed about 1,000 gallons of fuel to spill during a refueling, with a resulting clean up cost of over $300,000. *Id.* The jury found that the petitioner violated the duty to perform services in a good and workmanlike manner. *Id.* at 52. On appeal, the petitioner argued that the requirements for the extension of an implied warranty of good and workmanlike performance of services were not present. *Id.* The Texas Supreme Court noted that, to date, it had recognized an implied warranty for services only when those services related to the repair or modification of existing tangible goods or property. *Id.* at 52-53. It noted that public policy did not justify imposing an implied warranty for service transactions in the absence of a demonstrated and compelling need, and found that there is no compelling need when other adequate remedies

are available to the consumer. *Id.* at 53. The court also provided some examples of instances where there would be a compelling need: (1) where privity or reliance requirements prevent a wronged consumer from obtaining redress; or (2) where the difficulty of assigning responsibility prevent a wronged consumer from obtaining redress. *Id.* The court held that, because neither of these needs existed, and other remedies were available, Texas law did not recognize an implied warranty that services incidental to helicopter maintenance be performed in a good and workmanlike manner. *Id.*

Bray contends that *Rocky Mountain* merely clarified that when the repair performed is completely service oriented, the implied duty does not apply, absent compelling public policy considerations. This argument is without merit. There is nothing in the *Rocky Mountain* opinion indicating that its holding should be limited to contexts involving solely the performance of services and not in the context where consumer goods are involved. Moreover, the rationale of the *Rocky Mountain* limitation applies equally in both the purely services context and the mixed goods and services context, as in the case at bar.

Similar to the plaintiff in *Rocky Mountain*, Bray has not demonstrated any compelling need mandating the imposition of an implied duty to perform repair and modification services in a good and workmanlike manner. Bray is in privity with CA and thus has alternative remedies available to it, (i.e., a claim for breach of contract), which it has asserted in this case. Thus, Bray's claim for breach of implied duty to perform good and workmanlike services is not actionable under Texas law to the facts of this case. CA is entitled to summary judgment on this claim, and the Court need not address CA's argument that any claim brought under an implied duty is barred by the economic loss rule.

# IV.   Bray's Claims for Fraud, Fraudulent Inducement and Negligent Misrepresentation

## A.   Statute of Limitations

Aside from its arguments on the merits, CA moves for summary judgment on the ground that "many" of Bray's fraud and negligent misrepresentations claims are barred by the statute of limitations.  Bray has alleged fraud and fraudulent inducement to enter a contract.  The Court will examine each allegation in turn.  Bray's claims for fraud and fraudulent inducement are subject to a four-year statute of limitations, absent application of the discovery rule.  TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a) (Vernon 2002).  Bray's claims for negligent misrepresentation are subject to a two-year statute of limitations, absent application of the discovery rule.  *See Milestone Properties, Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 118-19 (Tex. App.–Austin 1993, no writ).  Under the discovery rule, an action does not accrue until the plaintiff knew, or in the exercise of reasonable diligence, should have known of the wrongful act and resulting injury.  *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997).  A claim for fraud or negligent misrepresentation is subject to the discovery rule and thus accrues when the plaintiff knew or should have known of the wrongful act.  *Id.*  (holding that discovery rule exception applies in cases of fraud and fraudulent concealment, and in other cases in which the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable).

The License Agreement was signed on January 9, 1996.  Bray filed its state court action on November 30, 2001.  Therefore, absent the application of a tolling principle, any claim for negligent misrepresentation that arose before November 30, 1999 and any claim for fraud that arose before November 30, 1997, would be barred by the applicable statute of limitations.  Bray asserts that CA made statements to Bray concerning: (1) when a generally available release of the software would be provided to Bray; and (2) the capabilities, quality, and functioning of the

software.  With respect to the first class of statements, Bray claims that throughout 1996, CA stated that a generally available release of the MK software would be available shortly and implored Bray not to invoke its contractual right to terminate the agreement if the generally available release was not available by September 15, 1996.  CA delivered the generally available release to Bray in late December of 1996.  Bray knew it had not received the software by the deadline in 1996.  Therefore, to the extent these statements by CA could be construed to state a claim for fraud or negligent misrepresentation, any such action accrued no later than December of 1996, when CA delivered the generally available version of the software.  The statute of limitations on any such claim based on fraud or negligent misrepresentation would have run in December of 1998 or December of 2000, respectively.  Therefore, any claim for fraud or negligent misrepresentation arising out of these facts is time barred.

With respect to the second type of statement, in its Second Amended Complaint under the heading "Negligent Misrepresentation" Bray seems to suggest that CA negligently misrepresented the quality and capabilities of the MK software and CA's services and that these misrepresentations "were intended to guide Bray in its selection of a new computer software system."[30]  The Court interprets this as a claim that CA induced it to choose its software and enter the License Agreement through its allegedly negligent misrepresentations.  Any such claims for "negligent inducement" are barred by the statute of limitations.  Bray admits in its complaint that it had repeated difficulties with the MK 7.0 software.  Bray had to experience those difficulties with MK 7.0 before or during August of 1997, because in that month Bray executed a Product Order and Documentation Update Forms for MK 7.2/9707, a later version of the MK 7.0 software.  Thus, to the extent it claims it relied on assurances and statements by CA about the software, Bray was

---

[30] Bray's Second Amended Complaint, pg. 20, para. 72.

on notice during August of 1997 that the software was experiencing numerous problems. Therefore, applying the discovery rule, the statute of limitations for any negligent inducement claim would have run in August of 1999. Accordingly, any such claim for negligent inducement is time barred.

**B.    Fraud**

**1.    Fraud**

CA argues that it is entitled to summary judgment on Bray's fraud claims because its alleged damages flow only from CA's alleged breach of contract. In other words, CA argues that Bray's claims for fraud are nothing more than a breach of contract action in disguise. The Court agrees.

Under Texas law, fraudulent conduct must give rise to liability independent of a contract for an action to sound in fraud instead of breach of contract. *See Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 352 (5th Cir. 2001) (citing *DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)). Bray's complaint is essentially that the software it purchased from CA did not perform properly and that it suffered damages by relying upon incorrect accounting data provided by the software. This claim is merely a claim for breach of contract due to the software's failure to operate according to its published specifications. Therefore, it does not give rise to a claim for fraud. *See Barbouti v. Munden*, 866 S.W.2d 288, 294 (Tex. App.– Houston [14th Dist.] 1993, writ denied), *overruled on other grounds by Formosa Plastics Corp. v. Presidio Engineers*, 960 S.W.2d 41, 47 (Tex. 1998) (citing *DeLanney,* 809 S.W.2d at 494). To the extent Bray is seeking to recover what it would have gained had CA fulfilled its promise under the warranty, the action is one for breach of contract. *See id.* (citing *Webber v. M.W. Kellogg Co.*, 720 S.W.2d 124, 129 (Tex. App.–Houston [14th Dist.] 1986, writ ref'd n.r.e.).

Bray's assertions to the contrary are without merit. Bray begins its argument by quoting the law as stated in *Formosa Plastics* that "tort damages are recoverable for a *fraudulent inducement* claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa Plastics*, 960 S.W.2d at 47 (emphasis added). It then incorrectly asserts that this rule has been extended to fraudulent contractual performance and fraud by deceit or omission. In support of these arguments it cites *Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 293 (Tex. App.–Corpus Christi 2000, pet. denied) and *Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 554 (S.D. Tex. 1997).

In *Kajima*, the plaintiff, an industrial construction company, sued the defendant for, *inter alia*, fraud, negligent misrepresentation, and breach of contract, alleging that the defendant caused delays which required its costs to exceed the amount it was paid under its contracts. 15 S.W.3d at 291. The plaintiff alleged two different types of fraudulent inducement. *See id.* The first allegation was that the plaintiff alleged that it was fraudulently induced to *enter* into the contracts in the first place. The plaintiff also made a second allegation that the defendant engaged in a "string along" fraud scheme whereby it made false promises to compensate the plaintiff for delays in order to keep the plaintiff working and then did not pay for the work. *Id.* The trial court limited the jury instruction to whether the plaintiff entered into the initial contracts as a result of fraud. *Id.* The plaintiff appealed on the ground that it was deprived of a submission to the jury on its claim that the defendant fraudulently induced it to perform conduct that was not contractually required and that occurred subsequent to the execution of the original contracts. *Id.* The court held that the trial court abused its discretion in submitting a fraud question that precluded consideration of the alleged fraud that occurred after the execution of the written contracts. *Id.* at 294. The Court

reasoned as follows:

> Regardless of whether we characterize the fraud in this case as fraudulent *inducement* to make an oral amendment to an existing contract, fraudulent *inducement* to enter into a new oral contract, fraudulent misrepresentation, fraudulent *inducement* to continue performance, or fraud in the performance, the essential requirement that a promise was made with no intention of performing when it was made has been established by some evidence.

*Id.* (emphasis added)(citations omitted). The key to the court's analysis was that the defendant made a promise to *induce* performance and that there was evidence that the promise was made with no intention of actually performing. The court reversed the trial court and remanded the case for a new trial. *Id.*

Bray's reliance upon *Metro* is also misplaced. In *Metro*, the district court concluded that the defendant had knowledge that the compressors it was selling had design defects. 984 F. Supp. at 548. The court held that the plaintiff met its burden of proof on its fraudulent inducement claim. *Id.* at 553, 555-56. Thus, the court held that the economic loss rule did not bar the plaintiff's claims for fraudulent inducement. *Id.* at 553. Here the claim was for fraudulent inducement to enter into a contract, not general common law fraud.

In sum, neither *Kajima* nor *Metro* support Bray's argument that it can recover tort damages for claims that do not give rise to liability independent of a contract. As declared by the Texas Supreme Court, recovery for tort damages that do not give rise to liability independent of a contract, are limited to claims for fraudulent inducement. The Court finds that Bray's claims for common law fraud fail as a matter of law. CA is entitled to summary judgment on Bray's claims for general common law fraud.

### 2. "String Along" Fraudulent inducement

In its Second Amended Complaint, Bray raises a fraudulent inducement claim similar to the claim raised by the parties in *Kajima*. Under the heading of "Fraud" in its Second Amended

Complaint Bray states the following:

> CA knew Bray was ignorant of the software's defects that produced erroneous financial reports and that Bray did not have an equal opportunity to discover the truth, *CA fully intended to induce Bray to continue as a CA customer by concealing or failing to disclose this fact, and Bray was injured as a direct and proximate result.*[31]

Unlike the general common law fraud claims just dismissed, these fraudulent inducement claims do purport to allege a duty and injury independent of the contract.

In *Kajima*, the Texas Supreme Court recognized a claim for fraudulent inducement where the plaintiff alleged that the defendant's fraud consisted of false promises to compensate the plaintiff for delays in order to keep the plaintiff working. 15 S.W.3d at 291. Though Bray does not allege that it was induced into performing any additional work or obligations under the contract, it alleges that it was induced into continuing to be a CA customer.

CA has moved for a no evidence summary judgment on apparently all of Bray's claims for fraud. Bray argues that CA induced it into continuing their contractual relationship by failing to disclose that the 9902 maintenance release and its corresponding patches were known to include a defective solution. There is a material question of fact as to whether or not Bray can satisfy the elements of its "string-along" fraudulent inducement claim.[32] Therefore CA is not entitled to summary judgment on this claim.

## C.    Negligent Misrepresentation

As alluded to above, under the heading of "Negligent Misrepresentation" in Bray's Second Amended complaint, Bray states that CA representatives provided Bray with false information

---

[31] *Id.* at 19-20, para. 69.

[32] Based upon the facts submitted to the Court, Bray's claim for "string-along" fraudulent inducement are timely pursuant to the four-year statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a) (Vernon 2002).

concerning the quality and capability of the MK software and CA's services. It also seems to raise a claim for negligent inducement when it states that "these representations were intended to guide Bray in its selection of a new computer software system."[33] In other places in its Second Amended Complaint, Bray refers to representations made by CA.[34] The Court has already concluded that any claims for negligent inducement are barred by the applicable statute of limitations. The Court must therefore address whether CA is entitled to summary judgment with respect to any general claims for negligent misrepresentation that Bray purports to assert.

CA also argues that Bray's claims for negligent misrepresentation are barred. Specifically it argues that where there is a contract in force between two parties, a party allegedly aggrieved by the conduct of the other party to the agreement cannot sue for negligent misrepresentation under Texas law. The Court disagrees with this as a broad assertion. As discussed below, under some circumstances, an aggrieved party can recover its out of pocket damages under a negligent misrepresentation theory. Under the facts of this case, however, those circumstances do not exist.

Bray concedes that a party cannot seek contractual benefit of the bargain damages under a cause of action for negligent misrepresentation. Bray argues, however, that based upon *D.S.A., Inc. v. Hillsboro Indep. School Dist.*, 973 S.W.2d 662 (Tex. 1998) ("*DSA*"), Texas law does not bar its claims for out of pocket, pecuniary loss. Bray's arguments are without merit. Contrary to Bray's apparent form of argument, the Texas Supreme Court's decision in *DSA* was not based solely upon the type damages the plaintiff was seeking. Rather its decision was based upon a determination that the plaintiff's negligent misrepresentation claim failed to allege any injury independent of its breach of contract claim. *See* 973 S.W.2d at 663.

---

[33] Bray's Second Amended Complaint, at 20, para. 72.

[34] *See, e.g., id.*, at 12, para. 43.

In *DSA*, a school district sued a construction management company for breach of contract, negligent misrepresentation, and DPTA violations resulting from the faulty construction of a school building. *Id.* The court stated that benefit of the bargain damages were not available for a claim of negligent misrepresentation. *Id.* Though the court did determine that out of pocket losses were theoretically recoverable for a claim of negligent misrepresentation, the court indicated that there were two prerequisites to recovery. *Id.* First, the plaintiff had to plead and prove the existence of a duty independent of any contractual duty. *Id.* (referencing *Formosa Plastics*, 960 S.W.2d 41, 46-47 (Tex. 1998). *Id.* In addition, in order to recover out of pocket damages under a negligent misrepresentation theory, the plaintiff had to plead and prove the existence of an injury that is separate and independent from any injury stemming from the breach of contract. *Id.* The court did not reach the issue of whether the defendant breached an independent legal duty to avoid making misrepresentations that would induce the plaintiff to enter a contract. *Id.* However, it held that the plaintiff was not entitled to damages because it did not prove the existence of an independent injury. *Id.* at 663, 664. Key to the Court's decision was that the plaintiff's theory of recovery and charge to the jury did not attempt any distinction between its claim for out of pocket damages and its claim for benefit of the bargain damages. *Id.* at 664. The court noted that the plaintiff was essentially only seeking to recover the benefit of its bargain. *See id.*

Negligent misrepresentation is a tort. Consistent with the Texas Supreme Court's reasoning in *DSA*, it has held that, with the exception of claims for fraudulent inducement, a party may maintain a tort action in addition to a breach of contract action only if the tort action is independent of the contract action. *See DeLanney*, 809 S.W.2d at 494. In determining whether an independent tort exists, courts look to both the source of the defendant's duty to act and the nature of the remedy sought. *Id.* Where the injury is an economic loss to the subject matter of the

contract, that loss sounds in contract, not in tort.  *Id.*

The Court recognizes that, unlike the *DSA* plaintiff, Bray has attempted to make a distinction between its claims for out of pocket damages and its claim for benefit of the bargain damages.  Therefore, Bray has alleged that it has suffered harm separate and independent from the economic loss to the subject matter of the contract, namely the MK software.  Nonetheless, other than its claims for negligent inducement upon which the Court has already granted summary judgment, Bray cannot allege that CA owed it any legal duty to avoid making negligent misrepresentations independent of CA's duty under the License Agreement.  Any negligent misrepresentations regarding the software's ability to create accurate financial reporting information were violations of the warranty in the License Agreement.  Therefore, because there was no breach of any duty implied by law, CA is entitled to summary judgment on any claims Bray purports to make under a general theory of negligent misrepresentation.

### Conclusion

For the reasons explained above, the Court GRANTS in part and DENIES in part CA's Motion for Summary Judgment (Dkt. #65).

It is so ORDERED.

Signed this 30th day of September, 2005.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE